Bernard P. CIARAMELLA,
Plaintiff–Appellant,

v.

READER'S DIGEST ASSOCIATION,
INC., Defendant–Appellee.

No. 337, Docket 96–9638.

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1997.

Decided Dec. 15, 1997.

Susan Ritz, New York City (Miriam F. Clark, Laura Nelsen, Steel Bellman Ritz & Clark, P.C., of counsel), for Plaintiff–Appellant.

Joseph Baumgarten, New York City (Gregory Reilly, Proskauer Rose LLP, of counsel), for Defendant–Appellee.

Before OAKES, MESKILL and CALABRESI, Circuit Judges.

OAKES, Senior Circuit Judge:

Plaintiff filed suit against Reader's Digest Association ("RDA") alleging employment discrimination under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 (1994) ("ADA"), and article 15 of the New York State Executive Law, N.Y. Exec. Law §§ 290–301 (McKinney 1993), and also violations of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 (1994) ("ERISA"). Shortly after the commencement of the action, the parties negotiated a settlement which Ciaramella later refused to sign. RDA moved for an order to enforce the settlement agreement. The United States District Court for the Southern District of New York (Charles L. Brieant, J.), granted the motion and dismissed the plaintiff's complaint with prejudice. Ciaramella argues that enforcement of the settlement agreement was improper because he had never signed the written agreement and the parties had specifically agreed that the settlement would not become binding until signed by all the parties. We agree, and reverse.

## I. BACKGROUND

In November 1995, Ciaramella filed suit against his former employer, RDA, alleging that RDA failed to give him reasonable accommodations for his disability of chronic depression and subsequently terminated his employment in violation of the ADA and article 15 of New York State Executive Law. Ciaramella also raised a claim under ERISA for failure to pay severance benefits.

Before the exchange of any discovery, the parties entered into settlement negotiations. The negotiations resulted in an agreement in principle to settle the case in May, 1996. RDA prepared a draft agreement and sent it to Ciaramella's then attorney, Herbert Eisenberg, for review. This draft, as well as all subsequent copies, contained language indicating that the settlement would not be effective until executed by all the parties and their attorneys. Eisenberg explained the terms of the settlement to Ciaramella, who authorized Eisenberg to accept it. Eisenberg then made several suggestions for revision to RDA which were incorporated into a revised draft. After reviewing the revised draft, Eisenberg asked for a few final changes and then allegedly stated to RDA's lawyer, "We have a deal." RDA forwarded several execution copies of the settlement to Eisenberg. However, before signing the agreement, Ciaramella consulted a second attorney and ultimately decided that the proposed settlement agreement was not acceptable to him and that he would not sign it. Eisenberg then moved to withdraw as plaintiff's counsel.

RDA, claiming that the parties had reached an enforceable oral settlement, filed a motion to enforce the settlement agreement on September 3, 1996. At a hearing on September 13, the district court granted Eisenberg's motion to withdraw, and stayed proceedings on the motion to enforce the settlement for thirty days to give Ciaramella time to obtain another attorney. On October 25, the district court heard RDA's motion to enforce the settlement agreement. Ciaramella had not yet obtained substitute counsel and appeared pro se at the hearing. The district court, after considering RDA's unopposed motion papers and questioning Ciaramella about the formation of the settlement agreement, granted RDA's motion to enforce the settlement by order dated October 28, 1996. The district court entered a judgment

of dismissal on October 29, 1996. This Court has jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

### A. Choice of Law

An initial question presented is whether New York or federal common law determines whether the parties reached a settlement of claims brought under the ADA, ERISA, and state law. The district court analyzed the issue using federal common law and concluded that the parties had intended to enter into a binding oral agreement. We review the district court's findings of law under a de novo standard, and its factual conclusions under a clearly erroneous standard of review. See Hirschfeld v. Spanakos, 104 F.3d 16, 19 (2d Cir.1997).

■■■ Because we find that there is no material difference between the applicable state law or federal common law standard, we need not decide this question here. See Bowden v. United States, 106 F.3d 433, 439 (D.C.Cir.1997) (declining to decide whether state or federal common law governs the interpretation of a settlement agreement under Title VII where both sources of law dictate the same result); Davidson Pipe Co. v. Laventhol & Horwath, Nos. 84 Civ. 5192(LBS), 84 Civ. 6334(LBS), 1986 WL 2201, at *2 (S.D.N.Y. Feb. 11, 1986) (finding no federal rule that would differ critically from New York's rule governing the validity of oral settlement agreements). New York relies on settled common law contract principles to determine when parties to a litigation intended to form a binding agreement.[1] See Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80-81 (2d Cir.1985) (applying principles drawn from the Restatement (Second) of Contracts to determine whether a binding settlement agreement existed under

New York law); see also Jim Bouton Corp. v. William Wrigley Jr. Co., 902 F.2d 1074, 1081 (2d Cir.1990) (describing the New York rule of contract formation as "generally accepted"). Under New York law, parties are free to bind themselves orally, and the fact that they contemplate later memorializing their agreement in an executed document will not prevent them from being bound by the oral agreement. However, if the parties intend not to be bound until the agreement is set forth in writing and signed, they will not be bound until then. See Winston, 777 F.2d at 80; V'Soske v. Barwick, 404 F.2d 495, 499 (2d Cir.1968). The intention of the parties on this issue is a question of fact, to be determined by examination of the totality of the circumstances. See International Telemeter Corp. v. Teleprompter Corp., 592 F.2d 49, 56 (2d Cir.1979). This same standard has been applied by courts relying on federal common law. See Taylor v. Gordon Flesch Co., 793 F.2d 858, 862 (7th Cir.1986) (enforcing an oral settlement of a Title VII case where the parties had not specified the need for a final, signed document); Board of Trustees of Sheet Metal Workers Local Union No. 137 Ins. Annuity & Apprenticeship Training Funds v. Vic Constr. Corp., 825 F.Supp. 463, 466 (E.D.N.Y.1993) (adopting the Winston analysis as based on "general contract principles" to uphold an oral settlement of an ERISA case); see also 1 Samuel Williston & Walter H.E. Jaeger, A Treatise on the Law of Contracts § 28 (3d ed. 1957) ("It is ... everywhere agreed that if the parties contemplate a reduction to writing of their agreement before it can be considered complete, there is no contract until the writing is signed.").

RDA urges us to fashion a federal rule of decision that would disregard this longstanding rule of contract interpretation and would

---

1. We note that New York Civil Practice Law and Rules 2104, N.Y. C.P.L.R. 2104 (McKinney 1997), which sets out technical requirements that must be met for a settlement agreement to be enforceable under New York law, may also apply. However, we need not address the issue whether section 2104 applies in federal cases or is consistent with federal policies favoring settlement. Cf. Monaghan v. SZS 33 Assoc., 73 F.3d 1276, 1283 n. 3 (2d Cir.1996) (reserving decision on whether federal courts sitting in diversity must apply section 2104 when relying on New York law). Because we agree with Ciaramella that, under common law contract principles, Ciaramella never formed an agreement with RDA, we have no reason to rely on section 2104 in this case. See Sears, Roebuck and Co. v. Sears Realty Co., 932 F.Supp. 392, 401-02 (N.D.N.Y. 1996) (interpreting section 2104 as a defense to contract enforcement, and not as a rule of contract formation).

hold parties to an oral settlement whenever their attorneys arrive at an agreement on all material terms.[2] We reject this suggestion. Even in cases where federal courts can choose the governing law to fill gaps in federal legislation, the Supreme Court has directed that state law be applied as the federal rule of decision unless it presents a significant conflict with federal policy. *See Atherton v. FDIC,* —— U.S. ——, ——, 117 S.Ct. 666, 670, 136 L.Ed.2d 656 (1997); *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 87, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994) (noting that "cases in which judicial creation of a federal rule would be justified .... are ... 'few and restricted'") (quoting *Wheeldin v. Wheeler,* 373 U.S. 647, 651, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963)).

We can find no federal objective contained in the ADA or ERISA that would be compromised by the application of the common law rules described above. RDA is correct that at least one of the federal statutes at issue expresses a preference for voluntary settlements of claims. *See* 42 U.S.C. § 12212 (1994) (encouraging the use of alternative means of dispute resolution, such as settlement, to resolve claims arising under the ADA). However, the common law rule does not conflict with this policy. The rule aims to ascertain and give effect to the intent of the parties at the time of contract. Such a rule promotes settlements that are truly voluntary. *See, e.g., Winston,* 777 F.2d at 80 ("Because of this freedom to determine the exact point at which an agreement becomes binding, a party can negotiate candidly, secure in the knowledge that he will not be bound until execution of what both parties consider to be final document [sic].").

In fact, it is the rule suggested by RDA that would conflict with federal policy. Enforcing premature oral settlements against the expressed intent of one of the parties will not further a policy of encouraging settlements. People may hesitate to enter into negotiations if they cannot control whether and when tentative proposals become binding. We therefore decline to adopt a federal

rule concerning the validity of oral agreements that is in conflict with federal policy and the settled common law principles of contract law.

### B. Existence of a Binding Agreement

This court has articulated four factors to guide the inquiry regarding whether parties intended to be bound by a settlement agreement in the absence of a document executed by both sides. *Winston,* 777 F.2d at 80. We must consider (1) whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. *Id.* No single factor is decisive, but each provides significant guidance. *See R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74–75 (2d Cir.1984) (granting summary judgment where all four factors indicated that the parties had not intended to be bound by an oral franchise agreement). The district court did not explicitly rely on the *Winston* test, but concluded that based on the evidence the parties intended to enter into a binding oral agreement. Considering the above factors in the context of this case, we are left with the definite and firm conviction that the district court erred in concluding that the parties intended that the unexecuted draft settlement constitute a binding agreement. *See United States v. United States Gypsum Co.,* 333 U.S. 364, 395–97, 68 S.Ct. 525, 542–43, 92 L.Ed. 746 (1948) (finding clear error where trial court's findings conflicted with uncontroverted documentary evidence); *Winston,* 777 F.2d at 83 (finding clear error where the district court had enforced an unsigned settlement and three of the four factors indicated that the parties had not intended to be bound in the absence of a signed agreement).

---

**2.** RDA relies on the Fifth Circuit's opinion in *Fulgence v. J. Ray McDermott & Co.,* 662 F.2d 1207 (5th Cir.1981) as support for this standard. However, RDA's reliance on *Fulgence* is mis-

placed because there was no suggestion in that case that the parties had ever explicitly reserved the right not to be bound until the execution of a written agreement.

### 1. Express Reservation

We find numerous indications in the proposed settlement agreement that the parties did not intend to bind themselves until the settlement had been signed. We must give these statements considerable weight, as courts should avoid frustrating the clearly-expressed intentions of the parties. *R.G. Group,* 751 F.2d at 75. For instance, in paragraph 10, the agreement states, "This Settlement Agreement and General Release shall not become effective ('the Effective Date') until it is signed by Mr. Ciaramella, Davis & Eisenberg, and Reader's Digest."

RDA argues that the effect of paragraph 10 was simply to define the "Effective Date" of the agreement for the purpose of establishing the time period in which RDA was obligated to deliver payment and a letter of reference to Ciaramella. RDA further urges that Ciaramella's obligation to dismiss the suit was not conditioned on paragraph 10. However, this interpretation is belied by the language of paragraph 2, which addresses RDA's payment obligation. Paragraph 2 states that RDA must proffer payment "[w]ithin ten (10) business days following the *later* of (a) the Effective Date of this Settlement Agreement and General Release (as defined by paragraph ten ... ) or (b) entry by the Court of the Stipulation of Dismissal With Prejudice" (emphasis added). Under the terms of the proposed settlement, RDA had no obligation to pay Ciaramella until the agreement was signed and became effective. Likewise, under paragraph 12 of the final draft, RDA was not required to send the letter of reference until the agreement was signed. The interpretation that RDA advances, that Ciaramella had an obligation to dismiss the suit regardless of whether the settlement was signed, leaves Ciaramella no consideration for his promise to dismiss the suit. The more reasonable inference to be drawn from the structure of paragraph 2 is that it provided Ciaramella with an incentive to dismiss the suit quickly because he would receive no payment simply by signing the agreement, but that execution was necessary to trigger either parties' obligations. *See, e.g., Davidson Pipe Co.,* 1986 WL 2201, at *4

(finding that wording in a settlement agreement that placed great significance on the execution date evinced an intent not to create a binding settlement until some formal date of execution).

Similarly, several other paragraphs of the proposed agreement indicate that the parties contemplated the moment of signing as the point when the settlement would become binding. The agreement's first paragraph after the WHEREAS clauses reads, "NOW, THEREFORE, with the intent to be legally bound *hereby,* and in consideration of the mutual promises and covenants contained herein, Reader's Digest and Ciaramella agree to the terms and conditions *set forth below: ....*" (emphasis added). This language demonstrates that only the terms of the settlement agreement, and not any preexisting pact, would legally bind the parties. Read in conjunction with paragraph 10, which provides that the settlement agreement is effective only when signed, this paragraph explicitly signals the parties' intent to bind themselves only at the point of signature. *See, e.g., R.G. Group,* 751 F.2d at 71, 76 (finding an explicit reservation of the right not to be bound absent signature in the wording of an agreement that declared, "when duly executed, [this agreement] sets forth your rights and your obligations"). In addition to the language of the first paragraph, paragraph 13 of the final draft[3] contains a merger clause which states,

> This Settlement Agreement and General Release constitutes the complete understanding between the parties, may not be changed orally and supersedes any and all prior agreements between the parties.... No other promises or agreements shall be binding unless in writing and signed by the parties.

The presence of such a merger clause is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement. *See, e.g., R.G. Group,* 751 F.2d at 76; *McCoy v. New York City Police Dep't,* No. 95 Civ. 4508, 1996 WL 457312, at *2 (S.D.N.Y. Aug.14, 1996) (refusing to enforce a settlement of a § 1983 claim

---

**3.** This language was contained in paragraph 12 of earlier drafts.

where a signed copy of the settlement agreement containing a merger clause had never been returned by the plaintiff).

Other parts of the agreement also emphasize the execution of the document. Paragraph 9 states, in relevant part,

> Mr. Ciaramella represents and warrants that he ... has executed this Settlement Agreement and General Release after consultation with his ... legal counsel; ... that he voluntarily assents to all the terms and conditions contained therein; and that he is signing the Settlement Agreement and General Release of his own force and will.

Ciaramella's signature was meant to signify his voluntary and informed consent to the terms and obligations of the agreement. By not signing, he demonstrated that he withheld such consent.

The sole communication which might suggest that the parties did not intend to reserve the right to be bound is Eisenberg's alleged statement to RDA's counsel, "We have a deal." However, nothing in the record suggests that either attorney took this statement to be an explicit waiver of the signature requirement. Eisenberg's statement followed weeks of bargaining over the draft settlement, which at all times clearly expressed the requirement that the agreement be signed to become effective. This Court has held in a similar situation that an attorney's statement that "a handshake deal" existed was insufficient to overcome "months of bargaining where there were repeated references to the need for a written and signed document, and where neither party had ever ... even discussed dropping the writing requirement." *R.G. Group*, 751 F.2d at 76; *see also Davidson Pipe Co.*, 1986 WL 2201, at *5 (holding that oral statement, "we have a deal," made by one attorney to another did not in and of itself preclude a finding that the parties intended to be bound only by an executed contract).

### 2. Partial Performance

. A second factor for consideration is whether one party has partially performed, and that performance has been accepted by the party disclaiming the existence of an agreement. *R.G. Group*, 751 F.2d at 75. No evidence of partial performance of the settlement agreement exists here. RDA paid no money to Ciaramella before the district court ordered the settlement enforced, nor did it provide Ciaramella with a letter of reference. These were the two basic elements of consideration that would have been due to Ciaramella under the settlement agreement.

### 3. Terms Remaining to be Negotiated

Turning to the third factor, we find that the parties had not yet agreed on all material terms. The execution copy of the settlement agreement contained a new provision at paragraph 12 that was not present in earlier drafts. That provision required RDA to deliver a letter of reference concerning Ciaramella to Eisenberg. The final draft of the settlement contained an example copy of the letter of reference annexed as Exhibit B. Ciaramella was evidently dissatisfied with the example letter. At the October 25, 1996, hearing at which Ciaramella appeared pro se, he attempted to explain to the court that the proposed letter of reference differed from what he had expected. He stated, "The original settlement that was agreed to, the one that was reduced to writing for me to sign had a discrepancy about letters of recommendation. I had requested one thing and the settlement in writing did not represent that." Because Ciaramella's attorney resigned when Ciaramella refused to sign the settlement agreement, and RDA thereafter moved to enforce the agreement, Ciaramella never had an opportunity to finish bargaining for the letter he desired.

In *Winston*, this Court found that the existence of even "minor" or "technical" points of disagreement in draft settlement documents were sufficient to forestall the conclusion that a final agreement on all terms had been reached. *Winston*, 777 F.2d at 82–83. By contrast, the letter of reference from RDA was a substantive point of disagreement. It was also, from Ciaramella's perspective, a material term of the contract since it was part of Ciaramella's consideration for dismissing the suit. On this basis, we find that the parties here had not yet reached agreement on all terms of the settlement.

*4. Type of Agreement That Is Usually Reduced to a Writing*

The final factor, whether the agreement at issue is the type of contract that is usually put in writing, also weighs in Ciaramella's favor. Settlements of any claim are generally required to be in writing or, at a minimum, made on the record in open court. *See, e.g.,* N.Y. C.P.L.R. § 2104; Cal.Civ.Proc.Code § 664.6 (West 1996). As we stated in *Winston,* "Where, as here, the parties are adversaries and the purpose of the agreement is to forestall litigation, prudence strongly suggests that their agreement be written in order to make it readily enforceable, and to avoid still further litigation." *Winston,* 777 F.2d at 83.

We have also found that the complexity of the underlying agreement is an indication of whether the parties reasonably could have expected to bind themselves orally. *See R.G. Group.,* 751 F.2d at 76; *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 262–63 (2d Cir. 1984) (finding that the magnitude and complexity of a four million dollar sale of six companies under the laws of five different countries reinforced the stated intent of the parties not to be bound until written contracts were signed). While this settlement agreement does not concern a complicated business arrangement, it does span eleven pages of text and contains numerous provisions that will apply into perpetuity. For instance, paragraph 6 determines how future requests for references would be handled, and also states that Ciaramella can never reapply for employment at RDA. Paragraph 7 states that Ciaramella will not publicly disparage RDA and agrees not to disclose the terms of the settlement agreement. In such a case, the requirement that the agreement be in writing and formally executed "simply cannot be a surprise to anyone." *R.G. Group,* 751 F.2d at 77; *see also Winston,* 777 F.2d at 83 (finding a four page settlement agreement that contained obligations that would last over several years sufficiently complex to require reduction to writing).

## CONCLUSION

In sum, we find that the totality of the evidence before us clearly indicates that Ciaramella never entered into a binding settlement agreement with his former employer. This conclusion is supported by the text of the proposed agreement and by Ciaramella's testimony at the October 25 hearing. Accordingly, the order enforcing the settlement is vacated and the case remanded for further proceedings. Costs to appellant.