Gil Q. ALVAREZ, Plaintiff,

v.

The CITY OF NEW YORK,
et al., Defendants.

Nos. 98 Civ. 2488(DC), 98 Civ. 7227(DC),
00 Civ. 0466(DC).

United States District Court,
S.D. New York.

May 17, 2001.

Jonathan C. Moore, New York City, for plaintiff.

Michael D. Hess, Corporation Counsel of the City of New York by Naomi Sheiner, Janice Birnbaum, Assistant Corporation Counsels, New York City, for defendants.

## OPINION

CHIN, District Judge.

Plaintiff Gil Q. Alvarez, a sergeant employed by the New York City Police Department (the "NYPD"), brought these actions asserting claims under Title VII, 42 U.S.C. § 1983, and the Americans with Disabilities Act (the "ADA"). Over the course of a year and half, the parties engaged in extensive settlement discussions. At two different junctures, the parties reported to the Court that a settlement had been reached, and each time, the Court

issued an order dismissing the case, allowing the parties time to execute a settlement agreement. Both times, however, resolution was not to be.

The second time, both sides advised the Court that the proposed terms, as discussed after after many hours of negotiation, were acceptable. But before a final settlement agreement could be signed, defendants were informed that plaintiff had fired his attorney, retained new counsel, and objected to the settlement. The cases were reinstated. Defendants—the City of New York (the "City"), the NYPD, and various police officers and City officials—now move to enforce the settlement. For the reasons that follow, defendants' motion is granted.

### BACKGROUND

The following constitute my findings of fact, which are based on the affidavits and other materials submitted by the parties as well as my personal knowledge of the settlement discussions and the prior proceedings.

### A. *The Lawsuits*

In October 1996, Alvarez filed a Title VII action (*"Alvarez I"*) in which he alleged that the NYPD had discriminated and retaliated against him because he had refused to submit negative performance evaluations of minority police officers who had complained of discriminatory treatment and the use of racial slurs by police officers. Alvarez, a law school graduate who is not admitted to the Bar, was represented in *Alvarez I* by Jonathan N. Fuchs, Esq. In early 1998, the parties settled *Alvarez I*, with the City paying Alvarez $62,500. *See generally Alvarez v. City of New York*, 2 F.Supp.2d 509, 511–12 (S.D.N.Y.1998).

Barely a month after the stipulation of settlement was "so ordered" in *Alvarez I*,

Alvarez commenced a second action (*"Alvarez II"*), alleging that the NYPD was discriminating and retaliating against him by, among other things, commencing an Internal Affairs investigation into his conduct. *See id.* at 513. Alvarez was represented in *Alvarez II* by Bonita E. Zelman, Esq.

In October 1998, Alvarez filed a third lawsuit (*"Alvarez III"*), represented by yet another attorney, Robert David Goodstein, Esq., also alleging retaliation by the NYPD. *See Alvarez v. City of New York*, 31 F.Supp.2d 334, 336 (S.D.N.Y.1998). In January 2000, Alvarez filed a fourth lawsuit (*"Alvarez IV"*) against the NYPD for retaliation, represented again by Goodstein. Goodstein took over *Alvarez II* for Zelman; *Alvarez II, Alvarez III,* and *Alvarez IV* were handled on a consolidated basis.

### B. *The Settlement Discussions Begin*

The parties entered into discussions to settle *Alvarez II* and *Alvarez III* in December 1998. At that time, plaintiff was represented by Goodstein. In April 1999, the parties agreed to a monetary settlement of plaintiff's claims, and counsel reported to the Court on April 28, 1999 that the cases had been settled. As a consequence, on April 28, 1999, the Court issued a "60–day order" dismissing the cases but providing that they could be reinstated within sixty days if settlement was not consummated.

Although the parties had agreed to a monetary settlement, several non-monetary issues remained. Perhaps most significantly, the settlement was conditioned upon the City granting plaintiff's then-pending application for a disability retirement; the parties agreed that plaintiff would retire once his application was granted. From April 1999 to December

1999, the parties continued to negotiate the non-monetary terms of the settlement agreement, with the Court twice granting extensions of the time in which the actions could be reinstated. During this period, at least six drafts of a settlement agreement were exchanged by the parties.

As of August 1999, only two minor items remained to be resolved. (*See* Declaration of Naomi Sheiner ("Sheiner Decl."), Ex. B). In October 1999, Goodstein informed defense counsel that he had not obtained a response from plaintiff on the outstanding issues. The Court held a conference to resolve the differences, at which time defendants added three new demands. The Court made recommendations with respect to the settlement of all five items. By November 23, 1999, the parties had reached agreement in principal on all five items, and had only to approve the final language of the settlement agreement.

On December 23, 1999, Goodstein requested a further extension of the period during which the parties could restore the actions to the Court's calendar. The Court denied this request on December 28, 1999 and restored the cases to its active calendar. Nonetheless, by December 30th, a draft settlement (the "December 1999 Stipulation") had been approved by the NYPD Legal Department and all the attorneys. (*Id.*, Exs. E, F). The December 1999 Stipulation was contingent on the approval of plaintiff's application for disability retirement.

In January 2000, however, the NYPD Medical Board denied plaintiff's disability retirement application. (*Id.*, Ex. G). Con-

sequently, the settlement fell through. Although plaintiff indicated his willingness to comply with the terms of the December 1999 Settlement if the Medical Board would reconsider, defense counsel informed him that defendants had no authority over the Medical Board. (*Id.*).

### C. *The Settlement Discussions Continue*

The Medical Board's decision did not end the settlement discussions. As an alternative, defense counsel proposed, in a letter dated January 6, 2000, that the parties enter into a settlement identical to the December 1999 Settlement, except that plaintiff would agree to separate from the NYPD with vested retirement rights upon execution of the settlement (the "January 2000 Settlement"). (*Id.*). In that letter, defense counsel proposed that "[p]laintiff's separation from service [would] be without prejudice to his right to pursue his current application for disability retirement ... and without prejudice to his right to seek judicial review in the event of the denial of his application for disability retirement pursuant to Article 78 of the CPLR." (*Id.*). According to defense counsel, both Goodstein and defense counsel "agreed that [this provision] permitted plaintiff to bring an Article 78 as a means of appealing the medical determination, but did not permit him to retain any right to assert any other claims including constitutional claims or claims under the ADA." (Sheiner Decl. ¶ 16).[1]

Plaintiff rejected this offer, and discovery continued. Plaintiff filed *Alvarez IV* on January 21, 2000. After another pretrial conference before the Court in March

---

1. Plaintiff apparently is misconstruing defense counsel's statement as suggesting that he is precluded from making certain arguments in any Article 78 proceeding to challenge the disability determination. (*See* Affidavit of Gil Q. Alvarez ("Alvarez Aff."), ¶ 40; Declaration of Dan Gazan ("Gazan Decl."), ¶¶ 5–6). That is not what I understand defense counsel to be suggesting. Plaintiff is free to make whatever arguments he wishes in the Article 78 proceeding; he cannot, however, under this language assert any claims in another action for damages.

2000, defendants made another offer: an increased monetary settlement with the same non-monetary terms. Plaintiff initially rejected this offer, and the parties met again with the Court to attempt to reach a settlement. Settlement conferences were conducted by the Court on May 30 and June 13, 2000, which were attended by plaintiff and counsel for both sides.

At the May 30th conference, plaintiff indicated that he was not willing to release certain Fair Labor Standards Act ("FLSA") claims asserted in two pending class action lawsuits. According to defense counsel, this was the first time plaintiff had made such a demand, and at no time did plaintiff claim that the January 2000 Settlement permitted him to assert federal claims in connection with the denial of his disability pension. (Sheiner Decl. ¶ 20; Declaration of Janice Birnbaum ("Birnbaum Decl."), ¶ 4).

At the end of the May 30th conference, the Court recommended a settlement amount and also recommended that plaintiff be permitted to retain his FLSA claims. The Court gave the parties a week to accept or reject the recommendation. Defendants agreed to the settlement amount and the retention of plaintiff's FLSA claims, but later informed Goodstein that the pension loss had been miscalculated. Goodstein reported this development to the Court and another conference was scheduled. Hence, at that point it appeared that only one issue remained—the amount to be paid to plaintiff.

Notwithstanding these discussions—which were focused primarily on the monetary settlement—plaintiff claims that he told Goodstein after the May 30th conference that "several non-monetary aspects [of the settlement] . . . remained very important to [him]." These items included his right to file an Article 78 proceeding challenging the denial of disability retirement; payment for accrued vacation, terminal leave, and compensatory time; and reimbursement of his rehabilitation expenses. (Alvarez Aff. ¶¶ 25, 32). At this point, the relationship between plaintiff and Goodstein began to sour.[2]

At the June 13, 2000 conference with the Court, plaintiff added a new condition of settlement—that the NYPD issue him a "good guy" letter, a letter certifying, in effect, that plaintiff was psychologically fit to retain his firearm license. Hence, only two outstanding settlement issues remained: plaintiff's demand for a "good guy" letter and the monetary amount of the settlement.

## D. A Deal Is Struck

At the close of the June 13th conference, the Court recommended a monetary amount to both sides and also made a proposal for resolving the issue of the "good guy" letter. As the Court's handwritten notes of the conference confirm, a final settlement proposal was thus in place and no issues were to be further negotiated:

> current deal + good guy letter proposal[;] no other issues can be renegotiat-

---

**2.** Plaintiff complains that Goodstein was rude to him and was more interested in a fee than in helping plaintiff with the non-monetary issues. (Alvarez Aff. ¶ 33). While I have no doubt that the relationship between plaintiff and Goodstein was sometimes less than cordial, I note that plaintiff has had four different attorneys in these cases. Moreover, Good-

stein achieved a substantial victory for plaintiff in obtaining a preliminary injunction and demonstrating a likelihood of success on the merits. *See Alvarez*, 31 F.Supp.2d at 336. Finally, Goodstein negotiated for plaintiff what I believe is a substantial and fair settlement. In any event, at no time did plaintiff limit Goodstein's authority to speak for him.

ed[;] Mr. Alvarez can have until 5 p.m. Wed. 6/14 to say yes; if he says yes, [defendants] have until 5 p.m. Thurs. 6/15 to say yes[.]

The concept was clear: the settlement proposal consisted of the terms previously agreed to, together with the Court's recommendations as to the amount and the "good guy" letter; the proposed settlement was not subject to further negotiation. Plaintiff was free to reject the proposal, in which case the litigation would continue. Plaintiff could also say "yes" and accept the proposal, in which case the litigation would end. At that point, there was no room for further negotiation of any terms; this was a "take it or leave it" proposition.

As the Court's notes confirm, plaintiff was given until the close of business on June 14, 2000 to say "yes"—to accept or reject the final proposed settlement. If he accepted, defendants had until the close of business on June 15 to advise the Court whether they would accept the final proposal. (Sheiner Decl. ¶ 22, Ex. H).[3]

On June 14, Goodstein called the Court and reported that plaintiff had said "yes," that plaintiff was accepting the settlement, and that plaintiff was even dropping his request for a "good guy" letter. Goodstein also called defense counsel and reported the same. Goodstein did not inform either the Court or defense counsel that there were any further concerns, nor could he have, for, again, plaintiff's options had been solely to accept the final proposal or to reject it; he did not have the option of attempting to further negotiate any terms.

Defense counsel confirmed defendants' acceptance of the final proposal and faxed Goodstein the December 30, 1999 draft (the latest draft available). She informed him that she was preparing a revised stipulation of settlement incorporating the terms that had been agreed upon subsequently. (Sheiner Decl. ¶ 23).

Defense counsel submitted the revised stipulation to the police commissioner for approval, receiving such approval on June 22, 2000. In the stipulation, defense counsel added a sentence seeking to clarify rights with respect to plaintiff's pension:

Plaintiff's separation from the [NYPD] is without prejudice to his rights (a) to pursue his current application for disability retirement ... and (b) in the event that his application is denied, to seek judicial review under Article 78 of the CPLR of the denial only. *Apart from the rights set forth in the preceding sentence, and as a condition of settlement, plaintiff waives all other claims concerning or arising from his application for disability retirement, including but not limited to any claims concerning retaliation, discrimination, breach of contract, or otherwise.*

(*Id.*, Ex. J at 7) (emphasis added).

That same day—June 22—defense counsel faxed the stipulation to Goodstein for final approval. On June 23, Goodstein called defense counsel with only one nonmaterial correction—that plaintiff was a named plaintiff (not a class member) in *Monserrate*, one of the two FLSA actions in which plaintiff's right to sue was pre-

---

**3.** After the conference, plaintiff apparently spoke with Goodstein about the non-monetary issues he had previously identified as important. According to plaintiff, he agreed to accept the settlement only after Goodstein assured him that the non-monetary issues would be resolved "in a favorable manner." (Alvarez Aff. ¶ 34). Goodstein purportedly told plaintiff that he could file an Article 78 to challenge the denial of disability pension "just like everybody else" in state court. (*Id.* ¶¶ 34, 41). Goodstein further purportedly informed plaintiff that he would obtain full vacation and terminal leave payments and that his rehabilitation expenses would be reimbursed. (*Id.* ¶ 35).

served. Defense counsel made the indicated correction, and mailed Goodstein four copies of the Stipulation of Settlement, along with other documents, for him to execute. In her cover letter, defense counsel explained that she did not sign the stipulations because plaintiff would immediately separate upon execution of the stipulation by defense counsel. Accordingly, she informed Goodstein that she would sign the stipulation after plaintiff's execution, "selecting a date when all necessary [NYPD] arrangements had been made to formally complete that separation." (Sheiner Decl. ¶ 26, Ex. J). Other than the Article 78 provision, the only differences between the December 1999 Settlement and the stipulation dated June 23, 2000 (the "June 23 Stipulation") related to plaintiff's separation with vested retirement rights, the increased monetary amount, and plaintiff's retention of the rights to pursue his FLSA claims. Based upon Goodstein's response, defense counsel instructed an NYPD employee to make the arrangements necessary for plaintiff's forthcoming separation.[4]

### E. *Plaintiff Refuses to Sign the Stipulation of Settlement*

Sometime after June 23, Goodstein provided plaintiff with a copy of the June 23 Stipulation. (Alvarez Aff. ¶ 43). Plaintiff refused to sign the June 23 Stipulation for three reasons: (1) it purportedly limited his rights to file an Article 78 proceeding, a term that plaintiff had not approved; (2) it did not specify key terms relating to payment for accrued vacation, terminal leave, and compensatory time; and (3) it did not specify whether the NYPD would reimburse payment for his rehabilitation

expenses. (*Id.* ¶ 25). At the time Goodstein presented the Stipulation, plaintiff claims that he again expressed his concerns about these three provisions. Plaintiff asked Goodstein to request that defense counsel remove the language that had been added with respect to the pension claims. (*Id.* ¶ 43). In addition, he told Goodstein that he did not think the NYPD would honor its obligation to pay him for accrued leave and rehabilitation unless the stipulation included express language to that effect. (*Id.* ¶ 44). Finally, plaintiff informed Goodstein that he wanted the NYPD's obligation to reimburse him for rehabilitation expenses put in writing. (*Id.* ¶ 47).

According to plaintiff, when he made these demands to Goodstein, Goodstein became upset and told plaintiff he would not speak with defense counsel again. (*Id.* ¶ 48). Thereafter, plaintiff discharged Goodstein and retained the services of his current attorney, Jonathan Moore, Esq. Moore thus became the fourth attorney to represent plaintiff before this Court.

Defense counsel never received executed copies of the settlement documents she sent to Goodstein on June 23, 2000. On or about July 7, 2000, Goodstein telephoned Assistant Corporation Counsel Janice Birnbaum and advised her that he had been discharged. On July 13th, defense counsel Naomi Sheiner received a letter from Moore advising of his retention. Four days later, on July 17, the Court— unaware of this latest snafu—again issued a 30–day order dismissing the three cases. (Sheiner Decl., Ex. L).

Defense counsel did not learn that plaintiff was purporting to repudiate the settle-

---

4. The employee, Sergeant Bill Tessler, had to, *inter alia,* arrange for plaintiff to be paid for accrued leave time upon his separation, change plaintiff duty status from "Modified" to "Limited Duty—No Guns," and discontin-

ue plaintiff's disciplinary case. (Sheiner Decl. ¶ 28). These efforts took "the better part of a week commencing on June 22." (*Id.*).

ment until August 1, 2000, when Moore moved to displace Goodstein as plaintiff's counsel of record and sought to restore the cases to the Court's calendar. (*Id.* ¶ 30). The Court granted both applications at a conference on August 14, 2000.

This motion followed.

## DISCUSSION

The issue presented is whether plaintiff is bound to the settlement proposed by the Court on June 13, 2000 because his attorney, Robert Goodstein, advised the Court the next day that plaintiff indeed was accepting it. I conclude that plaintiff is bound. Accordingly, defendants' motion is granted.[5]

### A. *Existence of a Valid Settlement Agreement*

Plaintiff makes two arguments in support of his contention that the parties did not enter into a valid settlement agreement. First, he argues that Goodstein lacked authority to settle the case because plaintiff only agreed to accept the settlement offer if certain issues were favorably resolved. Plaintiff further claims that the parties did not intend to be bound by any oral agreement. Both of these claims are rejected.

#### 1. *Goodstein's Authority to Accept the Settlement Offer*

■ In a case arising under federal law, an attorney's authority to bind his client to a settlement agreement is governed by federal law. *See In re Artha Mgmt., Inc.*, 91 F.3d 326, 328 (2d Cir. 1996); *Foster v. City of New York*, No. 96 Civ. 9271(PKL), 2000 WL 145927, at *2 (S.D.N.Y. Feb. 4, 2000). Although the decision to settle a case rests with the client, courts will presume that an attorney who enters into a settlement agreement has the authority to do so. *See Artha*, 91 F.3d at 329. Accordingly, a party challenging an attorney's authority to settle a case on his client's behalf bears the burden of showing that the attorney lacked the requisite authority. *See id.*

■ Courts in this Circuit have consistently recognized that an attorney may bind his client to a settlement agreement so long as the attorney has apparent authority. *See, e.g., Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir.1989) ("if an attorney has apparent authority to settle a case, and the opposing counsel has no reason to doubt that authority, the settlement will be upheld"). In this context, apparent authority is "the power to affect the [client's] legal relations ... by transactions with third persons, professedly as agent for the [client], arising from and in accordance with the [client's] manifestations to such third persons." *United States v. International Bhd. of Teamsters*, 986 F.2d 15, 20 (2d Cir.1993). As this definition suggests, apparent authority may only arise from the conduct or representation of

---

**5.** Although the parties do not dispute the Court's jurisdiction over this matter, a note on the issue is necessary. Because federal courts are courts of limited jurisdiction, the Supreme Court has held that a motion to enforcement settlement after a case has been dismissed must be supported by an independent basis of jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377–78, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). The holding of *Kokkonen*, however, is inapplicable to the instant motion. The Court's order of July 17, 2000 dismissed the cases but allowed any party to apply for their restoration to the Court's calendar if settlement was not consummated within thirty days. Plaintiff made such an application within the appropriate time period, and the cases were thus reinstated to the Court's calendar. Accordingly, the Court has jurisdiction over this matter.

the client toward the third party, not that of the attorney. *See id.*

In the instant case, plaintiff does not deny that he gave his attorney the authority to settle. (Alvarez Aff. ¶ 34). Rather, he argues that his acceptance was conditioned on the favorable resolution of the Article 78, terminal leave, and rehabilitation issues. (*Id.*). This argument, however, has no merit. At the June 13th settlement conference, the Court explicitly informed the parties—including plaintiff, who was present—that all issues save the monetary settlement and the "good guy" letter had been negotiated and were no longer on the table. The Court further informed the parties that the settlement offer was in essence an "all or nothing" deal—plaintiff had until 5:00 p.m. on June 14th to tell the Court whether he accepted the settlement, and if he accepted it, defendants had until June 15th to do likewise. Under these provisions, plaintiff's only choices were "yes" or "no"—not "yes, with strings attached." By giving his attorney permission to inform the Court of his acceptance, plaintiff agreed to the terms of acceptance set forth by the Court. Goodstein thus had actual authority to accept the agreement and settle the case.

Even if Goodstein did not have actual authority, plaintiff is still bound by the settlement agreement on the basis of Goodstein's apparent authority. Plaintiff participated in the two lengthy settlement conferences before the Court on May 30 and June 13, 2000. Yet, he never told the Court or defense counsel that Goodstein's authority was limited or that three issues remained to be resolved. He understood the Court's statement that all matters except for the money and the "good guy" letter were resolved and off the table.

Moreover, plaintiff failed to inform the Court or defense counsel of his attorney's allegedly unauthorized conduct until August 1, 2000—weeks after the Court had already dismissed the case. Accordingly, plaintiff is bound by his attorney's acceptance.

### 2. *The Parties' Intent to Be Bound by the Oral Settlement Agreement*

As a second argument, plaintiff contends that even if Goodstein had the authority to convey the acceptance, no valid settlement agreement was reached because the parties did not intend to be bound by the oral agreement. This contention is also rejected.

Whether parties have entered into a binding oral settlement agreement depends upon the parties' intent to be bound. *See Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 322 (2d Cir.1997) (stating that parties may bind themselves orally, but that if the parties do not intend to be bound until the agreement is written, such intent will be effectuated).[6] To resolve this issue, courts in the Second Circuit consider four factors, none of which is dispositive: (1) whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. *See id.* at 323 (citing *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985) and *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74–75 (2d Cir. 1984)). I discuss each factor in turn.

**6.** The Second Circuit noted in *Ciaramella* that there is no "material difference" between New York law and federal common law on this issue. *See Ciaramella*, 131 F.3d at 322. Accordingly, the Court need not decide which law should apply. *See id.*

#### a. *Express Reservation*

Plaintiff argues that this factor supports his position because the June 23 Stipulation that he refused to sign contained the following clause:

> This Stipulation of Settlement contains all the terms and conditions agreed upon by the parties hereto, and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Stipulation of Settlement regarding the subject matter of the instant proceeding shall be deemed to exist, or to bind the parties hereto, or to vary the terms and conditions contained herein.

(Sheiner Decl., Ex. J ¶ 18). In a typical case, such a clause would indicate that the parties only intended to be bound by a written agreement. Under the unique circumstances of this case, however, the inclusion of the clause in the unexecuted stipulation has no such effect. All parties at the June 13th conference knew and agreed that they would either accept or reject the settlement terms by informing the Court within a specific period. Plaintiff communicated his acceptance within the stated period, and the settlement was reached. Given the strong indication that all parties intended to be bound by the oral agreement, the "fact that [defendant's] counsel added boilerplate language to an otherwise substantively identical version of the oral agreement does not undermine the evidence that [the parties] intended to be bound by the oral agreement." *Pretzel Time, Inc. v. Pretzel Int'l, Inc.*, No. 98 Civ. 1544(RWS), 2000 WL 1510077, at *3 (S.D.N.Y. Oct. 5, 2000). Accordingly, this factor weighs in favor of enforcing the agreement.

#### b. *Partial Performance*

The second factor under the Second Circuit test applies when "one party has partially performed, and that performance has been accepted by the party disclaiming the existence of an agreement." *Ciaramella*, 131 F.3d at 325. Although defendants in this case began to prepare for consummation of settlement (most notably, by preparing for plaintiff's immediate separation from the NYPD), plaintiff never accepted defendants' "performance." On the other hand, there also was partial performance of the agreement in the sense that both sides, relying on the apparent settlement, did not resume active litigation of the case. Indeed, the case had been delayed for many months because of the settlement discussions, and the case was further delayed because Goodstein reported on June 14th that plaintiff had accepted the settlement. Hence, this factor does not weigh for or against enforcing the contract.

#### c. *Terms Remaining to be Negotiated*

Plaintiff contends that the parties had not agreed on all material terms of the settlement agreement because the three outstanding issues—Article 78, terminal pay, and rehabilitation expenses—had not been resolved. This claim is rejected.

The Court made clear at the close of the June 13 settlement conference that all previously negotiated terms were off the table, and that only the monetary amount and plaintiff's request for a "good guy" letter had yet to be resolved. When plaintiff communicated his acceptance of the monetary amount and dropped his demand for the "good guy" letter, the sole remaining issues were resolved. At no time during the conference did plaintiff—either personally or through his attorney—raise the three outstanding issues he now claims had yet to be negotiated. Having accepted the terms and conditions of the settlement agreement, plaintiff cannot now allege—after he has accepted the settlement agreement—that other terms remained.

Accordingly, this factor weighs in favor of enforcement.

### d. *Type of Agreement Usually Reduced to a Writing*

Defendants concede that the settlement agreement in this case is the type of agreement that is ordinarily written. Nonetheless, here there was a written settlement agreement that was substantially complete. The parties had extensively negotiated the language of the agreement, and only a couple of items remained. While the written agreement was not signed, the terms of the agreement had been largely reduced to writing. Hence, this factor weighs in favor of enforcing the agreement.

Upon consideration of the above factors—three of which favor enforcement and one of which does not weigh for or against enforcement—I find that the parties intended to be bound by the oral settlement agreement. As I have noted, the parties were well aware that all previously negotiated terms were off the table and that a phone call to the Court would close the deal. Plaintiff, a law school graduate who was present throughout the marathon settlement conference on June 13th, never gave any indication during that conference that he did not understand or agree to the arrangement. Indeed, plaintiff evidenced his understanding and agreement by authorizing his attorney to inform the Court that he accepted the monetary settlement.

In addition, by June 13th, the Court had invested a considerable amount of time in the settlement discussions. The Court met with the parties both separately and together, and spent a great deal of time speaking with plaintiff directly. In the end, the Court made it very clear that the negotiations were to be ended. Plaintiff was free to reject the proposal if he was not satisfied, and in that event the litigation would continue. But plaintiff chose to accept the settlement, and his acceptance was unequivocal and unconditional.

In light of these circumstances, the parties clearly intended that any acceptance of the June settlement offer would be binding.[7] The settlement agreement is therefore binding.

### B. *Application of CPLR § 2104*

■ Although the parties entered into a binding settlement agreement, this fact alone does not necessary ensure that the agreement is enforceable. Under New York law, an oral settlement agreement is only enforceable if it is made between counsel in open court. *See* N.Y.C.P.L.R. § 2104 (McKinney 1997); *Willgerodt v. Hohri,* 953 F.Supp. 557, 560 (S.D.N.Y. 1997), *aff'd,* 159 F.3d 1347 (2d Cir.1998). There is, however, considerable disagreement within this Circuit as to whether § 2104 applies to cases in federal court, particularly those based on federal question jurisdiction. *See Ciaramella,* 131 F.3d at 322 n. 1 (2d Cir.1997) (declining to decide whether § 2104 applies in federal question cases); *Monaghan v. SZS 33 As-*

---

7. In a letter dated February 9, 2001, plaintiff's present counsel claims, for the first time, that the settlement agreement is deficient because it does not preserve plaintiff's right to participate in a class action lawsuit alleging discrimination in the NYPD's disciplinary system, *Latino Officers Association v. City of New York,* 99 Civ. 9568(LAK). This contention is rejected. As part of the settlement agree-

ment, plaintiff agreed to a general release of all claims against the City and the NYPD except for certain actions (which were listed in the Stipulation of Settlement). Plaintiff had every opportunity to negotiate for the exclusion of the *LOA* case from his general release. That he failed to do so does not invalidate the settlement agreement.

*soc.,* 73 F.3d 1276, 1283 n. 3 (2d Cir.1996) (declining to decide whether § 2104 applies to diversity cases); *Pretzel Time, Inc.,* 2000 WL 1510077, at *3 (holding, without discussion, that § 2104 applied to Lanham Act case); *Foster,* 2000 WL 145927, at *2 n. 4 (stating that, even if § 2104 were to apply to § 1983 action, requirements of that statute were met); *Kilcullen v. Metro North Commuter Railroad Co.,* No. 95 Civ. 6331(CSH), 1998 WL 647171, at *7 n. 6 (S.D.N.Y. Sept. 21, 1998) (holding that 2104 did not apply to case arising solely under federal law). I need not reach the issue, however, for even if § 2104 were to apply, the oral settlement agreement reached in this case meets the standard set forth in the statute.

New York courts view the "open court" requirement of CPLR § 2104 as a "technical term that refers to the formalities attendant upon documenting the fact of the stipulation and its terms, and not to the particular location of the courtroom itself." *Popovic v. New York City Health & Hosps. Corp.,* 180 A.D.2d 493, 579 N.Y.S.2d 399, 400 (1st Dep't 1992); *see also Willgerodt,* 953 F.Supp. at 560. Accordingly, an oral settlement agreement is enforceable so long as it is in "substantial compliance" with § 2104. *See Monaghan,* 73 F.3d at 1283 (citing *Popovic,* 579 N.Y.S.2d at 400). Courts have found substantial compliance with § 2104 where (1) the court entered notice of the settlement in its calendar and computer records, *see Popovic,* 579 N.Y.S.2d at 400; (2) the settlement was reached on the record at a deposition or settlement conference, *see Willgerodt,* 953 F.Supp. at 560 and *Penn Columbia Corp. v. Cemco Resources, Inc.,* No. 88 Civ. 667(SWK), 1990

WL 6555, at *3–4 (S.D.N.Y. Jan. 19, 1990); or (3) the settlement was reached at or following a settlement conference before the court, *see Foster,* 2000 WL 145927, at *2 n. 4.

Here, there were extensive settlement conferences with the Court, and plaintiff's counsel reported his acceptance of the settlement offer directly to the Court via a phone call to chambers. On the basis of that communication, the Court issued an order dismissing the case with prejudice, subject to reinstatement by any party within thirty days if settlement was not consummated. In addition, the Court memorialized the settlement agreement on the record during a subsequent conference on August 14, 2000. These circumstances, taken together, sufficiently "document[ed] the fact of the stipulation" and therefore meet the requirements of § 2104. *Popovic,* 579 N.Y.S.2d at 400. Hence, the settlement agreement is enforceable under New York law.

### C. *Terms of the Settlement Agreement*

The final issue before the Court is whether the unexecuted June 23 Stipulation accurately reflects the settlement agreement reached by the parties at the June 13th settlement conference.[8] Plaintiff particularly objects to the language of paragraph 13 that he contends specifically limits the claims he may raise in any challenge to the denial of his disability retirement. Because defendants acknowledge that this language differed from previous drafts of settlement, I hold that it is not to be included.

In any event, I do not believe the sentence is necessary, because there is no real disagreement between the parties. Rath-

---

8. There is one provision of the June 23 Stipulation that both sides agree is no longer relevant. During the pendency of the instant motion, plaintiff has been removed from mod-

ified duty; therefore, the provisions of the settlement agreement that relate to a change in duty are no longer necessary.

er, it is apparent that plaintiff is misreading the additional sentence. According to plaintiff's pension attorney, this new language "significant[ly] curtail[ed] plaintiff's legal rights" because of the Medical Board's history of denying applications for retaliatory reasons. In instances where, as here, retaliation is a possible motive, the pension attorney claims, "it is imperative that the Article 78 petitioner be allowed to plead each and every basis that he reasonably believes caused, or contributed to, the administrative board acting in a manner contrary to law." (Gazan Decl. ¶ 11).

 The additional sentence does not "curtail" plaintiff's ability to challenge, via an Article 78 proceeding, the Medical Board's decision. Plaintiff is free to argue, in the Article 78 proceeding, that the Medical Board's decision was retaliatory, discriminatory, or otherwise contrary to law. What is clear, however, is that plaintiff is limited to the remedies available to him in an Article 78 proceeding.[9] Those remedies do not include damages, and he is precluded from bringing a lawsuit for money damages based on the Medical Board's decision, whether under a theory of retaliation, discrimination, or otherwise. The additional sentence did not seek to limit the theories that plaintiff could rely on in the Article 78 proceeding.

To the extent that plaintiff is now arguing that he should be able to bring a new action for damages challenging the denial of his application for disability retirement, this is clearly not what the parties intended. By settling these actions, defendants were bargaining for, *inter alia*, an agreement that plaintiff would not sue the City for damages a fifth time.

In conclusion, because I agree that the proposed sentence would only make explicit what was implicit, it is unnecessary. Because it was not included in the earlier drafts of the settlement agreement, it will not be included now.

In the end, I do not believe that plaintiff's three issues were ones of substance. As discussed above, the Article 78 issue is based on plaintiff's misreading of the new language included in the June 23 Stipulation. With respect to terminal pay, the NYPD is obligated to pay plaintiff the money he is owed once he retires with vested pension rights. If the NYPD fails to do so, plaintiff would be free to pursue his lawful remedies in a separate lawsuit, because a post-settlement dispute is not governed by the settlement agreement.[10] With respect to the rehabilitation expenses, I cannot imagine that this issue is a substantial one; moreover, plaintiff never raised it with the Court during the many hours of negotiations. It is apparent to the Court that, for whatever his reasons, four lawsuits and four attorneys later, plaintiff simply does not want to bring his long-running feud with the NYPD to an end. The final settlement is a fair one. Plaintiff accepted it. He now is bound by it.

### CONCLUSION

For the foregoing reasons, defendants' motion to enforce the settlement is granted. Defendants shall submit a proposed judgment on notice, within seven business days hereof, providing for judgment to be entered in accordance with the stipulation of settlement dated June 23, 2000, except that the provisions relating to modified

---

9. An Article 78 court is a court of limited jurisdiction and is unable to award monetary damages. *See Karamoko v. N.Y. City Hous. Auth.*, No. 99 Civ. 9712(DC), 2001 WL 459103, at *2 (S.D.N.Y. Apr. 26, 2001).

10. This Court does not retain jurisdiction over any such further lawsuits.

leave and the last sentence of paragraph 13 are to be deleted. Plaintiff's counsel shall promptly forward a copy of this decision to Goodstein, and plaintiff and Goodstein shall discuss the question of Goodstein's lien for attorneys' fees and costs. If they are unable to resolve this issue, Goodstein shall make an attorneys' fee application by June 1, 2001; plaintiff shall oppose by June 11, 2001.

SO ORDERED.