**Katrina CONWAY, Plaintiff,**

v.

**BROOKLYN UNION GAS COMPANY, Defendant.**

**No. 96 CV 6219 (NG RML).**

United States District Court, E.D. New York.

Nov. 7, 2002.

---

*ORDER*

GERSHON, District Judge.

I have reviewed Magistrate Judge Levy's Report and Recommendation of August 20, 2002, and the defendant's partial objection to it. The Report exhaustively sets forth the undisputed factual bases for its conclusions and comprehensively analyzes the applicable law. In his characteristically thoughtful fashion, Judge Levy recommends that the defendant's motion to enforce the terms of an oral settlement be granted but that defendant's further application for an injunction against the filing of further lawsuits against it and for attorney's fees be denied. The Report and Recommendation is adopted in its entirety. The oral settlement, the terms of which are described by Judge Levy, is held to be in effect and enforceable.

The court understands the defendant's frustration regarding plaintiff's conduct. Although an injunction is not issued, as Judge Levy indicated, other sanctions, including those under Rule 11 of the Federal Rules of Civil Procedure are available, if plaintiff files unfounded lawsuits.

This case is now terminated.

SO ORDERED.

## REPORT AND RECOMMENDATION

LEVY, United States Magistrate Judge.

Before the court is defendant's motion to enforce the terms of an oral settlement agreement with plaintiff, to enjoin plaintiff from filing further lawsuits against it and its employees and agents, and for attorneys' fees and costs. For the reasons stated below, I respectfully recommend that the settlement agreement be enforced, but that defendant's requests for an injunction and for attorneys' fees and costs be denied.

## BACKGROUND AND FACTS

Plaintiff Katrina Conway ("plaintiff" or "Conway") commenced this action against defendant Brooklyn Union Gas Company ("defendant" or the "Company") on December 19, 1996, alleging employment discrimination based on her race and gender, pursuant to 42 U.S.C. §§ 2e to 2000e and state law. Conway retained attorney Marshall Bellovin ("Bellovin") in January 1997. Settlement discussions took place periodically from 1998 to 2001.

At a settlement conference before me on January 18, 2001, attended by Conway, the parties explicitly agreed to three terms: (1) the Company would convert Conway's termination to a resignation; (2) the Company would provide Conway with a neutral reference for prospective employers; and (3) Conway would withdraw all of her lawsuits pending against the Company, its agents and employees. (*See* Affidavit of Alvin Adelman, sworn to October 11, 2001 ("Adelman Aff."), ¶ 6.) [1] The parties further agreed that the terms of the settlement would be kept confidential. At the conference, I personally confirmed with the parties that the sole remaining disagreement concerned the monetary amount the Company would pay to plaintiff and that any further negotiations would concern only money. Over the course of the following weeks, I held consensual *ex parte* discussions with each party in an attempt to reconcile their differences on that one remaining issue. At the conclusion of these discussions, I made a settlement recommendation and asked the attorneys to consult with their clients and tell me confidentially whether they accepted the recommendation. I instructed counsel to give me a yes or no answer and expressly stated that if the answer was no, I did not want to hear a counter proposal. I further advised counsel that I would not communicate their response to their adversary unless both parties accepted the recommendation, so that an acceptance could not be used as leverage to obtain further

---

**1.** In January 2000, plaintiff filed a *pro se* summons and complaint in the Civil Court, Kings County against Robyn Ruderman, a former associate of defendant's counsel, Cullen and Dykman LLP, relating to plaintiff's termination from the Company. On January 31, 2002, Conway also filed a grievance against Ms. Ruderman with the First Judicial Department. On June 15, 2000, plaintiff commenced a separate *pro se* action in this court, pursuant to 42 U.S.C. § 1983, against Brooklyn Union Gas Company claiming retaliatory discharge and amended her *pro se* complaint in August 2000 to add a claim against her Union, Local 101 Transport Workers Union, ALF–CIO. She filed a Stipulation of Discontinuance with respect to her *pro se* federal

action on July 14, 2001. In July 2000, Plaintiff filed a *pro se* summons and complaint in the Supreme Court, Kings County, against a fellow non-supervisory Brooklyn Union employee, Ann Mongiardo, alleging slander and defamation. Conway also alleged that Ms. Mongiardo played an "instrumental" role in her termination from the Company. After executing a Stipulation of Discontinuance relating to that case on June 27, 2001, plaintiff re-commenced the matter in Kings County Civil Court that same day. (*See* Affidavit of Catherine Murphy, sworn to October 11, 2001 ("Murphy Aff."), ¶¶ 5–10, 26–27; Letter to the court from Catherine Murphy, dated May 3, 2002.)

concessions. I also told the parties that an acceptance by both parties would constitute a settlement of the lawsuit. Both parties agreed to this procedure. During a consensual *ex parte* telephone conference on February 9, 2001, Mr. Bellovin notified the court that plaintiff had accepted my settlement recommendation of a monetary amount of $40,000 and reiterated that she also expected a resignation instead of termination; a neutral reference; and strict confidentiality. During the February 9 conference, I confirmed with Bellovin that plaintiff's acceptance of the $40,000 amount constituted an agreement to settle this case on the three terms plaintiff had accepted at the January 18, 2001 conference plus a payment of $40,000.

On March 2, 2002, defendant's counsel Alvin Adelman telephoned my chambers and reported that the Company accepted the court's settlement recommendation and agreed to a monetary payment of $40,000. (Adelman Aff., ¶ 9.) As of that date, the parties had reached agreement on all terms of the settlement.

On March 5, 2001 the court received a letter, dated March 1, 2001, in which Conway herself wrote directly to the court indicating that she would "settle the two cases that [she had] pending in the Eastern District"[2] but would not agree to dismiss the state court actions against Robyn Ruderman and Anne Mongiardo. (Letter to court from Katrina Conway, dated March 1, 2002.) ("the March 1 letter"). In the March 1 letter, however, plaintiff did not state that she had discharged her attorney or withdrawn or limited his authority to settle this case on her behalf. Nor did she explain why she was writing directly to the court.

On March 8, 2001, I held a consensual *ex parte* telephone conference with Bellovin and advised him that the case had settled, as the Company had agreed to the $40,000 recommendation. I asked him what if any effect plaintiff's March 1 letter had on his representation or the settlement. Bellovin confirmed that he continued to represent plaintiff and said that, to the best of his knowledge, he continued to have full authority to settle this case on the terms plaintiff had accepted on January 18, 2001 and February 9, 2001. I asked him to consult with his client and to notify me immediately if his authority had changed. The following day, Bellovin confirmed with defendant's counsel that the case had settled for $40,000, a neutral reference, a resignation rather than a termination, and the dismissal of all four pending cases against defendant and its agents. (Murphy Aff. ¶ 13). Bellovin asked defendant's counsel to draft the settlement papers using the "Dore" format as a model for the settlement agreement and general release.[3] (*Id.*). At that point, the sole outstanding issue was resolved, and the court considered the case settled.[4]

---

2. At the time of the letter, plaintiff had two cases pending in this court: this action and a subsequent *pro se* action concerning the circumstances of her termination, *Conway v. Brooklyn Union Gas, et al.*, 00 CV 3585(NG)(RML), filed June 15, 2000. Plaintiff voluntarily dismissed the 2000 *pro se* action with prejudice, by Order entered July 30, 2001.

3. The "Dore" model refers to a settlement agreement and general release used in a prior, unrelated case involving defendant and a different plaintiff, *Dore v. Brooklyn Union Gas*, 97 CV 2680(NG)(RML) ("*Dore*"). (*See* Murphy Aff. ¶ 14.) The court conducted joint settlement negotiations in this matter and Dore on October 6, 1999 and June 13, 2000, as both cases involved claims of racial discrimination against the Company and Bellovin represented the plaintiff in each case. The parties reached a settlement in *Dore* in December 2000.

4. During their March 9 discussions, Bellovin asked the Company to transmit the $40,000 in three separate checks to plaintiff, as in the Dore settlement, and said that he would pro-

From March 9 to June 12, 2001, however, Conway failed to respond to Mr. Bellovin's phone calls or correspondence. On April 18, 2001, Bellovin advised the court that "plaintiff had not responded to his telephone calls and letters [regarding] the status of [the] settlement." (Order dated April 18, 2001.) Accordingly, the court scheduled a status conference for May 9, 2001 and directed Conway to attend. On May 3, 2001, Conway faxed a request for a postponement of the May 9 conference because of a family emergency, and the conference was adjourned to June 12. (Letter to court from Katrina Conway, dated May 3, 2001.) Conway did not say in her letter that she was withdrawing her authority to agree to the settlement. On June 11, 2001, plaintiff informed her attorney that she had commenced and was pursuing *pro se* actions against an employee of the Company. At a status conference on June 12, 2001 before me, plaintiff withdrew her counsel's authority to settle under the terms she had previously accepted. However, she also agreed to withdraw all of her outstanding *pro se* actions. I issued a calendar order noting, in relevant part, that plaintiff:

> withdraws her authority to settle on the terms she concedes were agreed to by the parties and communicated to the Court. Plaintiff states that she is withdrawing her 2 pro se state court cases and one federal pro se case, within the next 2 weeks.

(Order dated June 12, 2001.)

At a hearing on June 25, 2001, New York Civil Court Justice Karen Yellen dismissed one of plaintiff's *pro se* actions pending in New York Civil Court, and on June 27, 2001 plaintiff withdrew her *pro se* action in Kings County Supreme Court against Ms. Mongiardo, an employee of defendant. However, Conway reinstated her *pro se* action against Ms. Mongiardo in Kings County Civil Court that same day, despite her attorney's warning that he would refuse to represent her if she continued any *pro se* actions based on the same facts as the instant case.

In August 2001, plaintiff requested a copy of the draft settlement from her attorney. After reviewing it, she returned it with the handwritten comments "No Agreement" and "Never" and indicated that she would only settle the case for $500,000. On September 18, 2001, plaintiff sent a letter to the court against her counsel's advice stating that she could never agree to the terms of the settlement. While she did not deny discussing the four terms mentioned *supra*, she specifically objected to being foreclosed from bringing future lawsuits relating to her termination from the Company.

A final settlement conference was held on October 12, 2001 (the same date the Company filed the instant motion). At the conference, Mr. Bellovin stated that Conway had previously given him authority to agree to the four terms discussed during the February 9 ex parte telephone conference. He also indicated that he had informed Conway that a settlement meant she would have to dismiss all of her claims deriving from the same set of facts. (Transcript of Settlement Conference, dated October 12, 2001 ("Settlement Tr."), at 2–3). Conway stated that, although she had agreed to the settlement generally,

---

vide the exact breakdown of the checks the following Monday, March 12. (Murphy Aff. ¶ 14.) On March 15 Bellovin informed defendant's counsel that he had not yet been able to reach his client, but would provide the breakdown as soon as he spoke to her. (*Id.*

¶ 15.) Bellovin never provided the figures. However, at no time prior to June 12, 2001, did Bellovin tell defendant's counsel that plaintiff had withdrawn his authority to settle the case. (*Id.* ¶ 16.)

she had not realized that she would have to withdraw the actions she had commenced *pro se.* (*Id.* at 6.) She also stated that she had since decided that $40,000 was not enough money. (*Id.* at 11.) She maintained that the terms and money would be acceptable if she could file other suits relating to this matter. (*Id.* at 12.) Defense counsel indicated that plaintiff had failed to comply with her promises of June 12th to withdraw her *pro se* cases, since she reinstated one and refused to withdraw another. (*Id.* at 13.) Defendant's counsel informed the court that defendant was seeking enforcement of the settlement, an order prohibiting Conway from suing the Company in the future, and attorney's fees. (*Id.* at 14.) Plaintiff's attorney moved to be relieved as counsel,[5] and plaintiff confirmed that she would not reconsider the settlement agreement. (*Id.* at 16, 19.)

## DISCUSSION

### A. *Attorney's Authority to Bind Client to Settlement*

 In a case arising under federal law, an attorney's authority to bind his or her client to a settlement agreement is governed by federal law.[6] *See In re Artha Mgmt., Inc.,* 91 F.3d 326, 328 (2d Cir. 1996); *Foster v. City of New York,* 96 Civ. 9271(PKL), 2000 WL 145927, at *2 (S.D.N.Y. Feb. 4, 2000). Although the decision to settle a case rests with the client, courts will presume that an attorney who enters into a settlement agreement has the authority to do so. *See Artha Mgmt.,* 91

F.3d at 329. A party challenging an attorney's authority to settle a case on his or her client's behalf bears the burden of showing that the attorney lacked the requisite authority to settle the case. *See id.; see also United States v. International Bhd. of Teamsters,* 986 F.2d 15, 19 (2d Cir.1993) ("The burden of proving that an attorney entered into a settlement agreement without authority is not insubstantial").

 Courts in this Circuit have consistently recognized that an attorney may bind his or her client to a settlement agreement so long as the attorney has apparent authority. *See, e.g., Fennell v. TLB Kent Co.,* 865 F.2d 498, 502 (2d Cir. 1989). Apparent authority in this context is " 'the power to affect the legal relations of [the client] by transactions with third persons, professedly as agent for the [client], arising from and in accordance with the [client's] manifestations to such third persons.' " *International Bhd. of Teamsters,* 986 F.2d at 20 (quoting Restatement Second of Agency § 26 Comment C (1958)). Apparent authority may only arise from the conduct or representation of the client toward the third party, not that of the attorney. *See id.* However, if an attorney has apparent authority to settle a case, and the opposing counsel has no reason to doubt this authority, then the settlement will be upheld. *See International Telemeter Corp. v. Teleprompter Corp.,* 592 F.2d 49, 55 (2d Cir.1979).

---

**5.** The court granted this motion on November 15, 2001 and gave plaintiff until January 18, 2002 to retain new counsel. Plaintiff has instead elected to proceed *pro se.*

**6.** The Second Circuit noted in *Ciaramella* that there is no "material difference" between New York law and federal common law on this issue. *See Ciaramella v. Reader's Digest*

*Ass'n, Inc.,* 131 F.3d 320, 322 (2d Cir.1997). The application of state law would not yield a different result because New York relies on the same "settled common law contract principles to determine when parties to a litigation intended to form a binding agreement." *See id.* Therefore, the court need not decide which law applies.

■ It is clear here that Bellovin had apparent authority from Conway, as he stated such in Conway's presence in open court at the settlement conference before me on October 12, 2001. (*See* Settlement Tr. at 2–3). Conway did not deny that she gave her attorney authority to settle, and in fact has never, to this day, contested the fact that her attorney had authority to enter into the settlement on her behalf. Nor has she argued that Bellovin's authority was limited in any way, either on February 9, 2001 when he accepted the final term of the settlement, or in March when he confirmed the settlement with defendant's counsel and agreed to a stipulation modeled after the Dore settlement. She knew Bellovin was involved in settlement negotiations and neither discharged him nor instructed him to revoke the agreement until the June 12, 2001 status conference, well after the parties had agreed on the four-point settlement. Similarly, the Company had no reason to believe that Conway would challenge or withdraw her attorney's authority to settle.[7] Plaintiff has therefore failed to meet her burden of proving with affirmative evidence that her attorney lacked apparent authority. Accordingly, plaintiff is bound by her attorney's acceptance of the settlement terms, assuming the requisite intent.

**B. *Parties' Intent to be Bound by the Oral Settlement Agreement***

■ Whether the parties have entered into a binding oral settlement agreement depends on their intent to be bound. *See Ciaramella v. Reader's Digest Ass'n, Inc.,* 131 F.3d 320, 322 (2d Cir.1997). If the parties do not intend to be bound until the agreement is written, they will not be bound until then. *Id.; see also Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1985). The Second Circuit has articulated four factors to determine whether parties intend to be bound by a settlement agreement absent a document executed by both sides: (1) whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. *See Winston,* 777 F.2d at 80 (citing *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 75–77 (2d Cir.1984)). It is important to note that *none* of these factors is dispositive. No single factor is decisive, but each provides significant guidance. *Id.* In addition, one may demonstrate intent by "oral testimony or by correspondence or other preliminary or

---

**7.** Plaintiff's March 1, 2001 letter to the court does not alter this conclusion. The fact that plaintiff expressed her emotions directly to the court or defendant was not unusual in this case, as plaintiff had often vented her feelings at settlement conferences, even though her attorney was present. In the end, however, consistent with accepted practice, it was always her attorney who expressed her official position on each issue, whether at the conference or at a later date after private consultation. It is significant that, at plaintiff's urging, Bellovin continued to represent plaintiff after March 1, 2001 until his voluntary withdrawal in October 2001, including at a settlement conference with the court on March 8, 2001 and discussions with defendant on March 9, 2001, when plaintiff's counsel confirmed Conway's agreement to the final term of the settlement. Even after Bellovin sent plaintiff copies of the settlement papers to execute, she did not advise the court, defendant, or her own attorney that Bellovin was not authorized to settle on her behalf. Plaintiff has presented no evidence that she ever placed restrictions on his authority. In such case, defendant was entitled to rely on Bellovin's representations as Conway's attorney. To find otherwise would discourage settlements and undermine the orderly conduct of litigation.

partially complete writings." *Id.* at 81; Restatement (Second) of Contracts § 27 Comment C (1981). I will address each factor in turn.

### 1. *Express Reservation*

 Parties satisfy the first element of the *Winston* test when there has been no express reservation and when other circumstances and actions of the parties indicate no reservation of the right not to be bound outside a final written agreement. *See R.G. Group, Inc.*, 751 F.2d at 74. In *International Telemeter Corp.*, the court found no evidence of a reservation of intent to be bound on the face of the settlement documents or in the actions of either party. *See International Telemeter Corp.*, 592 F.2d at 55. The court found particularly significant the fact that the stipulation and order of dismissal were signed and transmitted to opposing counsel. This fact, coupled with the previous lack of expressed intent not to be bound, indicated that the parties intended to be bound in the absence of a final written agreement. *See id.; see also Mone v. Park East Sports Medicine and Rehabilitiation, P.C.*, 99 CV 4990, 2001 WL 1518263, at *2–3 (S.D.N.Y. Nov.29, 2001) (defendant's counsel did not make an express reservation not to be bound in the absence of a signed writing when he faxed a letter to chambers stating matter had been settled and formal draft of the settlement would be forwarded); *see also Reich v. Best Built Homes, Inc.*, 895 F.Supp. 47, 49–50 (W.D.N.Y.1995) (enforcing settlement agreement, holding there was a lack of reservation of intent to be bound where counsel for both parties called and advised the court that a settlement had been reached and placed the agreement on the record through a conference call); *see also Sorensen v. Consolidated Rail Corp.*, 992 F.Supp. 146, 150 (N.D.N.Y.1998) (there was no dispute where the record revealed that the parties intended to be bound by the oral agreement between the parties' attorneys).

Here, neither party expressed a reservation of the right not to be bound in the absence of an executed agreement. In fact, the parties agreed orally to the terms of the settlement. The only written document anticipated by the parties was a settlement agreement and general release in a format that had recently been drafted and to which the parties had agreed and that was virtually identical, with the exception of the dollar amount, to the agreement in the Dore case, with which both counsel and the court were familiar. There is no language in that document, or any correspondence between the parties, indicating a reservation of right not to be bound. Unlike *Ciaramella*, where the settlement drafts contained language specifically stating: "This settlement Agreement and General Release shall not become effective . . . until it is signed . . . ," this draft did not contain any language suggesting that the parties did not intend to be bound until the point of signature. *Ciaramella*, 131 F.3d at 324.[8]

---

8. The draft agreement did have a clause stating:

> This Agreement contains the entire agreement and complete settlement between the parties and supersedes any and all previous agreements of any kind whatsoever between them, whether written or oral. All prior and contemporaneous discussions and negotiations have been and are merged and integrated into, and are superseded by, the Agreement. . . .

(Murphy Aff., Ex. M ¶ 12.) Plaintiff argues that this clause is effectively identical to the one in *Ciaramella* and indicates the parties' reservation of the right not to be bound in the absence of a writing. The court disagrees. The clause in *Ciaramella* was specific in stating that the parties did not intend the agreement to become effective until it was signed. The clause here says no such thing.

"The mere intention to commit an agreement to writing will not prevent contract formation prior to execution." *Winston*, 777 F.2d at 80. The fact that the Company's counsel added boilerplate language to the settlement draft, an otherwise substantively identical version of the oral agreement, does not undermine the evidence that the parties intended to be bound by their oral agreement. *See Alvarez v. The City of New York*, 146 F.Supp.2d 327, 335 (S.D.N.Y.2001).[9] Furthermore, an oral settlement agreement may be enforced in the absence of an executed formal agreement. *See International Telemeter Corp.*, 592 F.2d at 49 (enforcing oral settlement agreement although contemplated formal instrument not executed); *see also Foster*, 2000 WL 145927, at *3–4 (enforcing oral settlement agreement where attorneys negotiated settlement with the assistance of a magistrate judge and informed the court that settlement had been reached); *see also Ciaramella*, 131 F.3d at 322 ("parties are free to bind themselves orally, and the fact that they contemplate later memorializing their agreement in an executed document will not prevent them from being bound by the oral agreement").

### 2. *Partial Performance*

The second factor under the *Winston* test is met when one party has partially performed its obligations under the settlement, and that performance has been accepted by the party disclaiming the existence of an agreement. *See Ciaramella*, 131 F.3d at 325. As in *Ciaramella*, there is no evidence here indicating that there was partial performance, since no money exchanged hands. Nor does it appear that

any of the other terms of the settlement agreement were performed. *See id.* In *Alvarez*, the court found partial performance "in the sense that both sides, relying on the apparent settlement, did not resume active litigation of the case." *Alvarez*, 146 F.Supp.2d at 336. Here, as in *Alvarez*, neither party resumed active litigation relating to the instant case. In addition, the defendant did not resume activity relating to the three *pro se* cases, in reliance on plaintiff's representations that the cases were part of the global settlement. However, the court in *Alvarez* concluded that a party's decision not to resume active litigation during settlement discussions "does not weigh for or against enforcing the contract." *Id.* Accordingly, this factor does not tip the balance in either direction.

### 3. *Agreement to All Terms*

The court must consider a number of factors to determine whether points of disagreement remain. When the parties inform the court of their progress in settlement hearings, these hearings are often used as probative evidence. *See Foster*, 2000 WL 145927, at *3–4 (stating that an agreement had been reached in principle, as the attorneys for both parties informed the court on several occasions that they had reached an agreement); *Pretzel Time, Inc.*, 98 Civ. 1544(RWS), 2000 WL 1510077, at *4 (agreeing with party seeking to enforce settlement that when agreement was read into the record, in the presence of both parties' attorneys, and counsel did not immediately object to the transcription, there was agreement on all significant terms).

---

9. For this reason, defendant's addition of language indicating that plaintiff waives the twenty-one day waiting period in which to consider releasing any claims under the Age Discrimination in Employment Act does not undermine the enforceability of the agreement. Since plaintiff did not orally agree to that term, however, it should not be deemed part of the settlement agreement. *See Alvarez*, 146 F.Supp.2d at 339 (excluding one term that was not included in prior drafts).

With respect to this element, the parties explicitly agreed to three of the four terms at a settlement conference on January 18, 2001. At that time the parties agreed that: (1) the Company would convert Conway's termination to a resignation; (2) the Company would provide her with a neutral reference for prospective employers; and (3) *Conway would withdraw all of her lawsuits pending against the Company, its agents and employees.*[10] The parties remained apart only with respect to the monetary amount of the settlement. Both parties engaged in consensual *ex parte* conversations with the court over the course of the following weeks, with the explicit understanding that if both parties agreed to the court's monetary recommendation, the case would be settled. By March 2, 2001, both sides had agreed to a settlement sum of $40,000. On March 9, 2001, Conway's counsel confirmed with defendant's counsel that plaintiff had agreed to the settlement terms. *See Alvarez,* 146 F.Supp.2d at 336–37 (having accepted the terms of the agreement, plaintiff cannot allege that other terms remained). The fact that there was agreement to each term of the settlement and that the parties recognized there were no additional terms remaining to be negotiated, weighs heavily in favor of enforcement. Indeed, the parties had even agreed on the format for the settlement agreement and releases, down to the number of checks to be issued to plaintiff, as plaintiff's counsel had recently negotiated a similar settlement with the Company. Once a party agrees to the settlement terms, either orally or in writing, that party's later change of heart will not frustrate the agreement's enforceability. *See Foster,* 2000 WL 145927, at *4; *see also Brown v. Nationscredit Commer-*

*cial,* 99 CV 592, 2000 WL 888507, at *1 (D.Conn. June 23, 2000) ("once a settlement is reached, the agreement may not be repudiated by either party").

### 4. *Whether the Agreement is One Usually Committed to Writing*

According to New York Civil Practice Law and Rules § 2104, settlements of any claim are generally required to be in writing or, at a minimum, made on the record in open court. *See Ciaramella,* 131 F.3d at 326; N.Y. C.P.L.R. § 2104. As the court stated in *Winston,* "[w]here, as here, the parties are adversaries and the purpose of the agreement is to forestall litigation, prudence strongly suggests that their agreement be written in order to make it readily enforceable, and to avoid still further litigation." *Winston,* 777 F.2d at 83. The court in *Winston* also assessed the complexity of the underlying agreement— *i.e.,* whether it is the type of agreement that generally requires a written contract—by examining the following factors: (1) the amount of money at issue, (2) whether the terms of agreement will carry into perpetuity, and (3) the length and complexity of the agreement itself. *See id.* (describing a dispute involving $62,000, with payments to be made over several years, as a type of agreement that should be reduced to writing).

Here, even if the agreement is the type that is typically reduced to writing, the written draft of the settlement had essentially been finalized, since Mr. Bellovin had requested that the draft adopt the "Dore" model format. The terms, with the exception of the final dollar amounts, were "substantially complete" and "largely reduced to writing." *Alvarez,* 146 F.Supp.2d at

---

**10.** In fact, this term would most likely be implied in any settlement agreement. Obviously, an agreement that required the defendant to pay money to settle the case but allowed the plaintiff to continue other lawsuits against the defendant and its employees and agents relating to the same events would be meaningless.

337. Moreover, the parties had confirmed to the court, as part of the process of negotiating the monetary amount, that their agreement on a sum would settle the case. It is also important to note that the presumption in favor of written settlements or placement of these agreements on the record does not expressly prohibit enforcement of an oral settlement agreement.[11] *See Hartford Fire Ins. Co. v. SS "AN CHUN",* No. 96 Civ. 7783, 1997 WL 790578, *2 (S.D.N.Y. Dec.24, 1997) (enforcing oral settlement agreement).

### 5. *Fairness of the Settlement*

Although it is not ordinarily a factor that courts consider in deciding whether or not to enforce an oral settlement agreement, I am obliged to note that this court is intimately familiar with the settlement, having worked closely with the parties to settle this case, and I believe that the terms to which they agreed are eminently fair and reasonable. Plaintiff has expressed a need for "healing." (*See* Letter to the court from Katrina Conway, dated March 16, 2002.) This settlement addresses that need and provides an opportunity for plaintiff to receive compensation, put this matter behind her and move forward, a result she might not achieve through further litigation, which is likely to be contentious and drawn out. Since the above factors demonstrate that plaintiff gave her attorney authority to enter into the settlement and unequivocally intended to be bound by the oral settlement agreement— an agreement that provides her with an equitable resolution of her claims—I re-

spectfully recommend that the settlement agreement be enforced.[12]

### C. *Injunction Against Filing Future Lawsuits*

 As part of its motion, defendant seeks to enjoin Conway from filing additional lawsuits against the Company and its employees and agents relating to her termination. District Courts, of course, have authority to enjoin a litigant from initiating vexatious actions. *See* 28 U.S.C. § 1651(a); *Abdullah v. Gatto,* 773 F.2d 487, 488 (2d Cir.1985) (per curiam). In determining whether or not to restrict a litigant's future access to the courts, the following factors must be considered: (1) the litigant's history of vexatious, harassing or duplicative lawsuits; (2) the litigant's motive; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties; and (5) whether sanctions would be adequate to protect the civil parties. *Fitzgerald v. Field,* No. No. 99 Civ. 3406, 1999 WL 1021568, at *5 (S.D.N.Y. 1999). *See also Pratol v. Londa,* No. CV–87–2041, 1987 WL 18775, at *3 (E.D.N.Y. Oct.14, 1987). "Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." *Safir v. United States Lines, Inc.,* 792 F.2d 19, 24 (2d Cir.1986).

 It is true that plaintiff has demonstrated a tendency to renege on agreements and has expressed an intent to continue filing lawsuits against the Company

---

**11.** In this case the parties placed three of the four terms of the settlement on the record at the conference held on January 18, 2001, and each party confirmed with the court, as well as each other, their agreement to the remaining term, and hence the settlement, during the ensuing negotiations.

**12.** In addition to meeting plaintiff's needs, enforcing the settlement promotes the efficient use of judicial resources and "preserves the integrity of settlement as a meaningful way to resolve legal disputes." *Brown v. Nationscredit Commercial,* 99 CV 592, 2000 WL 888507, at *1 (D.Conn. June 23, 2000):

and its employees and agents. Once she receives the compensation that she and her attorney worked so hard to negotiate, however, her claims will be deemed resolved and there will be no rational justification for filing additional claims or causing the Company to incur further costs.

Nonetheless, I am not persuaded that an injunction restricting plaintiff's access to federal courts is warranted. I do not believe plaintiff's actions rise to the level of abuse or harassment, and an injunction is a drastic measure. The cases in which courts have enjoined parties from bringing suits involve litigants with substantially longer histories of "vexatious litigation" than plaintiff's. *See, e.g., Safir,* 792 F.2d at 24; *In re Martin–Trigona,* 737 F.2d 1254, 1259 (2d Cir.1984); *Buell v. Bruiser Ken,* No. 97 CV 1131, 1999 WL 390642, at *5–6 (E.D.N.Y. March 31, 1999). Moreover, I seriously question this court's authority to limit plaintiff's access to the state courts. I therefore respectfully recommend that defendant's request for an injunction be denied, but admonish plaintiff that she has previously agreed to withdraw all of her lawsuits against the Company and its employees and agents. Her continuation to file lawsuits in this court relating to her termination may result in severe sanctions.

### D. *Attorney's Fees and Costs*

█ As defendant concedes, there is "no statutory authority" for the granting of attorneys' fees or costs here. (*See* Defendant's Memorandum of Law, dated October 11, 2001, at 11.) Therefore, fees and costs may only be awarded "as a matter of equity" where "a party has acted in bad faith, vexatiously or wantonly." *Sorensen,* 992 F.Supp. at 151. Plaintiff has certainly engaged in inappropriate behavior at times throughout this case, and the court sympathizes with defendant's frustration at hav-

ing spent valuable time and resources in working to reach an equitable resolution, only to have plaintiff go back on her promises and continue her campaign of litigiousness. On the other hand, I do not find that plaintiff has acted "in bad faith, vexatiously or wantonly." Many of her communications with the court appear to arise out of sincere conviction, although at times seemingly misplaced. I therefore respectfully recommend that this request be denied. However, plaintiff is on notice that the filing of additional cases relating to her employment or termination may result in the imposition of attorneys' fees and costs.

### CONCLUSION

In sum, it is undisputed that Conway gave her attorney apparent authority to enter into the settlement agreement on her behalf. In addition, the four factors of the *Winston* test, which provide "significant guidance" as to whether or not a plaintiff intended to be bound, demonstrate plaintiff's intent to enter into a binding oral agreement. I therefore respectfully recommend that defendant's motion to enforce the settlement agreement be granted, but that defendant's requests for an injunction and for attorney's fees and costs be denied.

Aug. 20, 2002.