Donald A. LANGREICH and, C.
Albert Burke, Plaintiffs,

v.

Jerry GRUENBAUM, et
al., Defendants.

No. 06 CV 4931(BSJ).

United States District Court,
S.D. New York.

Feb. 12, 2011.

James Edward Pratt, Law Office of James Pratt, Garden City, NY, for Plaintiffs.

Boris Sorin, Sylvor & Richman, LLP, New York, NY, for Defendants.

## ORDER

BARBARA S. JONES, District Judge.

After having reviewed Magistrate Judge Dolinger's Report and Recommendation dated January 25, 2011, and having received no objections thereto, I hereby confirm and adopt the Report in its entirety, having been satisfied that there is no clear error on the face of the record. *See King v. Greiner*, No. 02 Civ. 5810(DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (citation omitted); *see also Wilds v. United Parcel Serv.*, 262 F.Supp.2d 163, 169 (S.D.N.Y.2003). Accordingly, defendants' motion to enforce a settlement (docket number 27) is denied.

 The parties' failure to file written objections precludes appellate review of this decision. *See Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir.2008).

The Clerk of the Court is directed to close the case.

**SO ORDERED.**

## *REPORT & RECOMMENDATION*

MICHAEL H. DOLINGER, United States Magistrate Judge.

Defendants have moved for an order enforcing what they claim was a final agreement between them and plaintiffs Donald A. Langreich and C. Albert Burke to settle this case. Plaintiffs oppose the motion, although they too seem to argue that a binding agreement was reached,

only not the one for which the defendants are pressing. For the reasons that follow, we recommend that defendants' motion be denied, and that the parties be directed to proceed to complete the litigation of their case unless they all sign a document embodying the agreed-upon terms of a settlement.

*Prior Events*

Plaintiffs filed this lawsuit in 2006, asserting claims for fraud, securities fraud and breach of the New York Business Corporations Law in connection with corporate management decisions and the handling of shares of an entity now known as Concordis Group as part of a corporate merger. Defendants moved to dismiss the complaint, a motion granted in part on January 30, 2009. *Langreich v. Gruenbaum*, 2009 WL 321253 (S.D.N.Y. Jan. 30, 2009). Since the court's decision left standing a claim for fraud, *id.* at *6–7, we conducted a scheduling conference and ordered that discovery be completed by July 31, 2009 and that all pre-trial proceedings be ended by August 31, 2009. (Order, Apr. 9, 2009). We subsequently extended the discovery deadline to September 14, 2009 and scheduled a settlement conference. (Order, July 30, 2009; Order, Aug. 5, 2009).

On August 18, 2009 we conducted the settlement conference, at which time the parties appeared to agree on the basic terms of a resolution of the litigation, including issuance to the two plaintiffs of 150,000 shares of Concordis Group and registration of all shares held by the plaintiffs. They also represented that their counsel would proceed to draft a written agreement and stipulation of discontinuance. No such agreement was ever finalized, and we therefore scheduled a status conference for December 18, 2009.

At that conference, defendants' attorney advised that he had prepared and sent to

plaintiffs' counsel in September a draft that embodied what he believed were the terms of the agreement reached in August. He reported that he had heard nothing back from plaintiffs' attorney until a few days before the December conference, when he received a demand from opposing counsel seeking the addition of new and unacceptable terms in the agreement. He further represented that, as a result, his clients were prepared to pursue needed discovery and litigate the matter. (Tr. at 2).

In response, plaintiffs' attorney noted that defendants' September draft was materially incomplete because the oral agreement in August included a commitment by defendants to register both the new shares and the shares that plaintiffs already held. He also adverted to a need to ensure against dilution of the shares, an issue that had been alluded to in discussions during the settlement conference. He also insisted that if the defendants would not agree to those conditions, plaintiffs were also prepared to litigate the case. (Tr. at 2–4).

Although not mentioned by plaintiffs' counsel, it appears as well that plaintiffs had made a number of additional demands before the conference, including a requirement for the issuance of an opinion letter and payment of some cash. (Tr. at 4–5). In any event, at the conference defendants made plain their rejection of these additional terms although they were apparently willing to register the shares. (Tr. at 4–5).

Having heard this account, we observed that at the August conference the parties had agreed to the transfer of 150,000 shares to each of the plaintiffs and registration of all shares. (Tr. at 6, 8–9). We further advised that "[i]f the Plaintiffs are prepared to repudiate their agreement, the defendant has two choices, either to move to enforce the agreement or to pursue discovery and let the chips fall where they

may." (Tr. at 6). We then gave both counsel the opportunity to state whether their clients were adhering to the agreement as we understood it, and after consultation they advised that they were now in disagreement about the scope of the registration requirement. (Tr. at 7–8). Although even at that point there appeared to be a joint understanding of the registration obligation, defendants' counsel announced that he wished to proceed with the litigation and obtain a discovery schedule "because obviously I guess from what I gather right now there wasn't a meeting of the minds." (Tr. at 8). He went on to say that "if in the meantime we get to an agreement of exact language you want in the document—because I kind of wish you would have given it to me sooner and we probably wouldn't have to be here, but we're here but I still believe strongly we should set a discovery schedule." (Tr. at 8).

In a last effort to have the parties confirm the obvious—that they had been in agreement on the most essential terms four months before—we invited them to state at that time on the record that they would comply with their prior agreement. (Tr. at 8–9). We further observed that memorializing the agreement would be a very simple task of drafting, taking "probably an hour or less" and offered to witness the signing of the agreement by the parties the following week. (Tr. at 9). We further ordered that all discovery was to be completed by the end of March but stayed that discovery for the following week "to permit the parties—if they wish—to sign on the dotted line a stipulation that is very simple and should not encompass more than one page embodying the provisions which I just mentioned were agreed to at the last conference." (*Id.*). Finally, we noted that a schedule was now in place and must be adhered to "if one side or the other doesn't want to sign."

(*Id.*). Following the conference we issued an order confirming that discovery was to end by March 31 and that a joint pretrial order was due by April 18, 2010 unless either side moved by then for dispositive relief. (Order, Dec. 18, 2009).

The parties then proceeded with discovery. On March 22, 2010, however, defendants' counsel sent us a letter complaining about plaintiffs' alleged sloth in providing documents and asking for a hearing "to address the fact that the case has been settled" or, alternatively, for an order setting a new schedule for discovery. (Letter from Boris Sporin, Esq., to the Court (Mar. 22, 2010)). By endorsed order we denied the request, noting that we had already set a schedule, which we expected the parties to adhere to. (Endorsed Order, Mar. 22, 2010).

It appears that counsel on both sides as well as plaintiffs themselves then attended a settlement meeting on March 24, 2010, and seemingly came to an agreement, embodied in a document entitled "Agreement", which both plaintiffs signed, apparently on that date. That agreement provided, among other things, for the issuance of 100,000 shares to each plaintiff and to James Pratt, Esq., their attorney, and it obliged the defendants to file a registration statement with the SEC within six months and to take "all steps necessary for the registration statement to become effective." The agreement also provided that any amendments or modifications were to be in writing signed by both plaintiffs and defendants or their authorized representatives. (Letter from James E. Pratt, Esq., to Boris Sorin, Esq. (May 6, 2010) ("May 6 Letter") (on file with the court); *see also* Mot. to Enforce Settlement Agreement, June 6, 2010, at Ex. D).

At the same time, the attorneys both signed a stipulation of discontinuance dated March 24, 2010, presumably indicating that plaintiffs (who were present) as well as defendant Gruenbaum (who was overseas and thus absent) agreed to the settlement terms reflected in the agreement. (May 6 Letter; Mot. to Enforce Settlement Agreement, at Ex. E). According to plaintiffs' counsel, it was also agreed that the stipulation would be held for filing until the defendants had executed the settlement document. (May 6 Letter).

Consistent with prior history in this case, defendants never signed the March 24 agreement, even though their attorney submitted the stipulation of discontinuance to the court, albeit in violation of the parties' understanding that it would be held until the defendants signed the "Agreement" document. Instead, it appears that on April 16 defendants' attorney called plaintiffs' counsel and asked to change the wording of the Agreement to dilute defendants' obligation to file a registration statement within six months, and to substitute instead a provision requiring only "best efforts." (*Id.*). By letter dated May 6, with a copy to the court, plaintiffs' attorney advised his opposite number that plaintiffs rejected the proposed change and renewed his request that defendants sign the March 24 agreement. (*Id.*).

That same day we issued an order noting that the deadline for discovery had expired and directing that the parties submit a joint pretrial order by May 28, 2010 unless a potentially dispositive motion had been filed by that date. (Order, May 6, 2010). In lieu of a joint pretrial order, defendants filed a motion to enforce the August 18, 2009 alleged oral agreement. That motion has been fully briefed, with plaintiffs contending that the only binding agreement was that reached on March 24, 2010. Notably, however, plaintiffs do not request that the court order its enforcement.

The motion papers add several details to the narrative that we have recited. Most notably, on defendants' side, defendant Nathan Lapkin confirms that the March 24 "agreement" was accepted by plaintiffs and asserts that his attorney agreed to it to end the dispute, but he goes on to say that he and his fellow defendant Gruenbaum rejected it because they could not guarantee a six-month deadline to file a registration statement. (Aff. of Nathan Lapkin, at ¶¶ 8–10).

Lapkin reports as well that on May 11, 2010 the attorneys for both sides and Gruenbaum participated in a telephone conference to try to settle the matter, and he claims that they agreed on various modified terms, as reflected in a document later authored by plaintiffs' counsel, Mr. Pratt and sent to defendants' attorney. (*Id.* at ¶ 11). According to Lapkin, plaintiffs withdrew their six-month-registration demand, and the parties agreed to "further amplify the registration language" and to include a requirement that the shares were to be restricted and subjected to SEC Rule 144, but with an opinion letter from counsel for Concordis specifying that the shares be freed from restrictions consistent with the requirements of Rule 144. (*Id.*). Lapkin supports this account by proffering a memo from Mr. Pratt sent to defendants' attorney on May 13, 2010. (Mot. to Enforce Settlement Agreement, at Ex. F). In addition, however, he mentions that Mr. Pratt sent plaintiffs' attorney another memo the following day, adding requirements that the parties had not agreed to (including adding more individuals to the settlement agreement). (Mot. to Enforce Settlement Agreement, at Ex. G). Moreover, Lapkin confirms that defendants would not agree to those terms. (Aff. of Nathan Lapkin, at ¶ 12).

Predictably, plaintiffs offer a somewhat different account of events, in the form of an affidavit by Mr. Langreich. He starts by misstating in part what was agreed to at the August 18 conference, stating that the parties agreed that Concordis would issue 100,000 shares each to him, to Burke and to Platt.[1] (Aff. of Donald A. Langreich, at ¶ 5). He also accurately states that they agreed that the new and old shares would be registered. (*Id.*). He then observes that his attorney actively negotiated with defendants' counsel in September, October and November and could not reach agreement on the other terms. He also correctly recalls the events at our December 18, 2009 conference, the parties' subsequent discovery efforts, and the meeting of counsel and the plaintiffs, the signing by plaintiffs of the written agreement dated March 24, and the attorneys' execution of the discontinuance stipulation. (*Id.* at ¶¶ 6–15). He further confirms that the stipulation was to be held until defendants signed the agreement, that they never did so, and that on April 16 their attorney asked to water down the registration requirement. (*Id.* at ¶¶ 16–17).

As for the later telephone conference between counsel (apparently on May 11), he reports that plaintiffs' counsel agreed that plaintiffs would withdraw their six-month-registration demand, that counsel for Concordis would "promptly" provide an opinion letter to its stock transfer agent to allow certain shares held by plaintiffs and Pratt to be freed from Rule 144 restrictions (specifically shares held by them prior to a 1 to 25 reverse split), and that Concordis counsel would issue a second opinion letter to the stock transfer agent, permitting the newly issued shares to be

---

**1.** The oral agreement at the time actually referred to issuance of 150,000 shares each to the two plaintiffs.

freed from Rule 144 restriction when they became eligible for Rule 144 exemption. He also agrees that these terms were memorialized by Mr. Pratt in his May 13 memo, which including wording that the opinion letters were to cover a list of people to whom Langreich had given some of the shares. He further confirms that the next day Mr. Pratt sent another memo listing the names of the individuals to whom Langreich had given shares. (*Id.* at ¶¶ 22–23). He also reports that the parties had agreed that defendants' counsel would prepare the latest version of the settlement agreement, and states that defendants never prepared the agreement but rather filed their motion to enforce the August 18, 2009 terms. (*Id.* at ¶¶ 24–25).

### ANALYSIS

Defendants' motion reveals an ambiguity as to the relief that they seek. The motion papers request enforcement of the August 18, 2009 settlement terms (Defs.' Mem. of Law at 1), but in their evidentiary proffer they seem to contend that the parties bound themselves to somewhat different terms by way of the May 11, 2010 telephone conference, as reflected in the May 13 memorandum of plaintiffs' counsel. (Mot. to Enforce Settlement Agreement, at Ex. F). However we interpret their current posture, their motion should be denied.

#### Basic Standards

■ As a general rule, oral settlement agreements entered into by the parties before the court are valid and enforceable. *See Powell v. Omnicom,* 497 F.3d 124, 129 (2d Cir.2007) (noting a "voluntary, clear, explicit, and unqualified stipulation of dismissal entered into by the parties in court and on the record is enforceable even if the agreement is never reduced to writing, signed, or filed") (quoting *Role v. Eureka Lodge No. 434, I.A. of M & A.W. AFL–CIO,* 402 F.3d 314, 318 (2d Cir.2005)). Nonetheless, there are circumstances in which the court may find an oral agreement unenforceable or may prefer to exercise its discretion to release a party from such an agreement.

The Second Circuit has left open the question of whether state or federal law controls the enforceability of oral settlement agreements, whether in federal-question or diversity cases. *See, e.g., Monaghan v. SZS 33 Assocs., L.P.,* 73 F.3d 1276, 1283 n. 3 (2d Cir.1996) ("We assume, without deciding, that New York law provides the rule of decision for determining the validity of the oral settlement agreement."). Nonetheless, federal courts in the Second Circuit regularly apply New York law, observing that there is no meaningful substantive difference between federal and New York law with regard to enforceability. *See, e.g., Ciaramella v. Readers' Digest Ass'n, Inc.,* 131 F.3d 320, 322 (2d Cir.1997) ("[W]e find there is no material difference between the applicable state law or federal common law standard"); *Monaghan,* 73 F.3d at 1283 n. 3 ("[T]he federal rule regarding oral stipulations does not differ significantly from the New York rule"); *see also Willgerodt ex. rel. Majority Peoples' Fund for the 21st Century, Inc. v. Hohri,* 953 F.Supp. 557, 560 n. 1 (S.D.N.Y.1997).

■ In determining whether oral agreements are enforceable in the absence of a fully executed document, the courts are guided by the intent of the parties, as demonstrated by their "words and deeds". *Winston v. Mediafare Ent'mt Corp.,* 777 F.2d 78, 80 (2d Cir.1986). In *Winston,* the Second Circuit specified four factors that should guide the court's inquiry into whether the parties intended to be bound by the oral agreement at issue:

(1) whether there has been express reservation of the right not to be bound in the absence of writing; (2) whether there has been partial performance of

the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and, (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Id.* (citing *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 75–77 (2d Cir. 1984)). No single factor is dispositive; rather, all four factors should be considered for their bearing on the parties' intent in the context of the entire case. *See, e.g., Powell,* 497 F.3d at 129 (quoting *Winston,* 777 F.2d at 80); *Massie v. Metro. Museum of Art,* 651 F.Supp.2d 88, 89, 93–98 (S.D.N.Y.2009); *Lindner v. Am. Express Corp.,* 2007 WL 1623119, at *4 (S.D.N.Y. June 5, 2007).

### I. Assessment of Defendants' Motion

We address the *Winston* factors *seriatim,* resting on the assumption in the first instance that defendants seek to enforce the August 18 oral agreement.

#### 1. Express Reservations

The first requirement concerns whether the parties intended to consent to a binding agreement without a writing. The court must determine whether there are "indications in the proposed settlement agreement that the parties did not intend to bind themselves." *Ciaramella,* 131 F.3d at 324. Considerable weight is accorded to such statements, as courts should avoid frustrating the clearly expressed intentions of the parties. *See R.G. Group,* 751 F.2d at 75.

■ In this case neither side proffers any evidence of statements made during the August 18 conference indicating whether the parties were prepared to bind themselves without a writing. We note, however, that the attorneys explicitly undertook to prepare a written settlement agreement, and in view of the nature of the proposed resolution of the case—which involved issuance of stock and registration

of both new and old stock—it would have been entirely reasonable for the parties to assume that additional terms might be needed to iron out procedural, and possibly substantive, issues, an assumption that seems borne out by the apparently still-born efforts of the parties to negotiate further between September (when the first draft was sent by defendants' counsel) and the December 18, 2009 conference.

#### 2. Partial Performance

The second *Winston* factor looks to whether one party has partially performed and whether that performance has been accepted by the party disclaiming the agreement. *R.G. Group,* 751 F.2d at 75; *see also Powell,* 497 F.3d at 130; *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,* 145 F.3d 543, 551 (2d Cir.1998); *Kowalchuk v. Stroup,* 61 A.D.3d 118, 123, 873 N.Y.S.2d 43, 47 (1st Dep't 2009). We infer that the timing of performance may be significant, and that if one of the parties sought to repudiate the agreement before partial performance, the fact that the other side persisted in performing would have little weight. *E.g., Lindner,* 2007 WL 1623119, *8.

In this case there is no indication that any party undertook to perform, either by arranging to issue stock or by pursuing any effort to register any of the stock. Moreover, although defendants' counsel drafted a proposed agreement and sent it to opposing counsel in late September—more than a month after the settlement conference—there is no indication that plaintiffs thereafter acquiesced in its terms or otherwise induced any reliance by defendants. In fact, the parties then continued to negotiate terms, involving both the amount of stock to be issued and the conditions of its issuance. These findings militate against finding either an agreement or its partial performance. *See, e.g., Lind-*

*ner,* 2007 WL 1623119 at *8; *Alvarez v. City of New York,* 146 F.Supp.2d 327, 336 (S.D.N.Y.2001).

### 3. *Existence of Open Terms*

The third *Winston* factor looks to whether the parties agreed on all material terms. *See Ciaramella,* 131 F.3d at 325. The agreement in this case was a fairly basic one, involving issuance of stock and registration of both that stock and shares previously acquired by plaintiffs. Nevertheless, the parties did not explicitly agree at the August 18 conference on the timing of registration—a matter of more than passing interest—and it is not entirely clear whether they explicitly agreed that defendants would undertake no steps to dilute the plaintiffs' shares. Indeed, these were issues raised by plaintiffs in the wake of the conference and not fully resolved until at least the December 18 conference.

### 4. *The Type of Agreement*

The fourth *Winston* factor is whether the agreement is of a type that is generally committed to writing. To determine whether the agreement is one normally reduced to writing, we are guided initially by N.Y. C.P.L.R. § 2104, which governs whether a writing is required under New York law in these circumstances. *See, e.g. Silas v. City of New York,* 536 F.Supp.2d 353, 359 (S.D.N.Y.2008). The provision states:

> An agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered.

N.Y. C.P.L.R. § 2104. In substance this provision requires either (a) a subscribed written agreement, (b) a court order or (c) an agreement between counsel "in open court". In this case, absent a written, signed agreement or a court order, defendants must rely upon the notion that the agreement in question and the manner of its confirmation satisfied the "open court" requirement. A transcribed proceeding is sufficient to meet this test. *See, e.g., Alvarez,* 146 F.Supp.2d at 337; *Monaghan,* 875 F.Supp. at 1042; *cf. Rivera v. Triple M. Roofing Corp.,* 116 A.D.2d 561, 562, 497 N.Y.S.2d 416, 417 (2d Dep't 1986); *Silas,* 536 F.Supp.2d at 359–60. In this case, the agreement was not transcribed, though it was reflected in informal notes by the court itself. Whether such informal notes taken in connection with robing-room conversations should be construed as an agreement "in open court" is at least doubtful. *See In re Dolgin Eldert Corp.,* 31 N.Y.2d 1, 9–10, 334 N.Y.S.2d 833, 839–40, 286 N.E.2d 228 (1972) ("Judicial proceedings in 'open court' . . . and informal conferences in chambers or robing rooms or even a courtroom are manifestly disparate."). This is particularly true in view of the recent observation of the New York Court of Appeals that N.Y. C.P.L.R. § 2104 should be construed strictly in accordance with its literal terms, to ensure that settlement agreements, once properly entered into, can be treated as reliable indicators of the parties' intent and hence rigorously enforced. *See Bonnette v. Long Island Coll. Hosp.,* 3 N.Y.3d 281, 285–86, 785 N.Y.S.2d 738, 740–41, 819 N.E.2d 206 (2004).

That said, we note that the decision in *Bonnette* appears at least potentially inconsistent with the prior observation by the Second Circuit in *Monaghan* that "substantial compliance" with N.Y. C.P.L.R. § 2104 is sufficient. *See Monaghan,* 73 F.3d at 1283 (dictum) (citing *Popovic v. New York City Health and Hosp. Corp.,* 180 A.D.2d 493, 493, 579 N.Y.S.2d 399, 400 (1st Dep't 1992)). Nonetheless, we view *Bonnette* as a more reliable indi-

cator at least of New York law on the subject.

Apart from the potential effect of section 2104, we have already noted that the agreement in question was of a nature that suggested the desirability, if not the absolute necessity, of a written instrument reflecting the terms of settlement. The agreement involved only a handful of provisions, but they contemplated some fairly substantial financial transactions, including the issuance of shares and registration with the SEC, and in consequence partook of the sort of agreement that parties normally insist be reduced to writing, as counsel explicitly contemplated at the August conference.

### 5. *Conclusion of Winston Analysis*

Based on a review of the pertinent considerations, we conclude that the parties did not intend to be bound by the August 18 oral agreement and contemplated instead that the conclusive agreement be in writing. On that basis alone, defendants' request to enforce that agreement must be denied.

### 6. *Alternative Analysis*

■ Defendants' request to enforce the agreement of August 18 must be rejected for still another, independent reason. Simply stated, even if that agreement had originally been binding, defendants chose to rescind it at the December 18 conference.

As noted, at that conference we addressed the possible willingness of the parties to accept the terms that we understood had been agreed to by the litigants at the August conference. Given the stated choice either to adhere to those terms or to pursue discovery and litigate the matter, counsel for defendants announced that he had concluded that there had been no meeting of the minds at the August 18 conference and that defendants wished to pursue discovery. Moreover, the court then set a discovery schedule but invited the parties to use the next week to settle, but instead defendants actively pursued discovery, seeking to complete it by the specified March 31, 2010 deadline. Indeed, it was only late in March—more than three months after the December conference—that defendants complained about plaintiffs' performance in discovery and then alluded to their new contention that the August 18 conference had yielded an enforceable agreement that they wished the court to impose on plaintiffs.

As noted, defendants were free at the December 2009 conference to seek to enforce the August 2009 terms but chose not to do so, and opted instead to litigate the case. In doing so, they then imposed on plaintiffs the burden to participate in discovery, and by taking that course may be held to their choice, in effect, to rescind any potentially enforceable prior agreement or, alternatively, to waive any claim for enforcement. *See Lemus v. Manhattan Car Wash, Inc.*, 2010 WL 4968182, at *9–10 (S.D.N.Y. Nov. 24, 2010) (precluding plaintiff from enforcing a settlement agreement and simultaneously rescinding the agreement to pursue his original claims); *Consolidated Edison Co. of New York, Inc. v. Fyn Paint & Lacquer Co., Inc.*, 2008 WL 852067, at *13–14 (E.D.N.Y. Mar. 28, 2008) (finding that plaintiff had "waived its right to enforce any of these purported conditions [of a settlement agreement] by failing to invoke them until now."). Furthermore, to the extent that defendants then proceeded in April and May 2010 to engage in further negotiations with plaintiffs and, purportedly, to different binding agreement with them, they plainly also waived any ground for enforcement of the August 2009 terms. *Consolidated Edison Co.*, 2008 WL 852067, at *13–14.

In short, defendants' course of conduct at and subsequent to the December 2009 conference precludes granting their motion to enforce the August 2009 settlement arrangement.

## II. *Assessment of Defendants' Motion Alternatively Construed*

There remains the possibility that defendants are seeking to enforce a settlement agreement with defendants as purportedly reflected in the May 13, 2010 memorandum of defendants' counsel. This effort too must fail.

We start with the conceded fact that the plaintiffs and both sides' counsel reached apparent agreement on altered terms at the March 24, 2010 meeting, that these terms were embodied in a writing signed by plaintiffs and that the attorneys for both sides contemporaneously executed a stipulation of discontinuance, reflecting at least the assumption by defendants' attorney that his absent clients would sign the settlement agreement. The defendants of course rejected one provision of that agreement—involving a requirement of registration within six months—and hence no binding agreement was made despite the concededly erroneous subsequent submission by defendants' counsel of the stipulation of discontinuance.

If defendants are seeking enforcement of some version of a 2010 agreement, it must be premised on the telephone conversation of May 11 and the follow-up May 13 memo of Mr. Pratt, but it must also exclude Mr. Pratt's May 14 memo, which, according to defendants, makes new demands that are unacceptable. This pick-and-choose approach to finding an enforceable agreement is antithetical to the *Winston* analysis and in this case in particular is wholly unpersuasive.

The purported May 11 agreement was oral, and for all the reasons that we have previously noted, we view it as entirely unrealistic to expect that by April or May 2010 any of the parties would have expected to be bound by an oral agreement. Indeed, in view of (1) the failure to bring to fruition the terms assertedly agreed to in August 2009, (2) the concession by defendants' counsel at the December 2009 conference that there had been no meeting of the minds in August or thereafter, and (3) the repudiation by defendants of the written March 24 agreement that their own attorney had approved (and which also contained a provision specifying that any changes must be in writing), it would have been folly for either counsel or their clients to assume that the case could or would be conclusively settled by a phone conversation.

As for the writing that defendants cite, it was followed only a day later by another writing that added terms that the defendants thereafter rejected. This scenario amply demonstrates that the parties had not agreed on all of the pertinent terms. Similarly, we note that no party engaged in any performance based on the May 11 discussions. Furthermore, for reasons already noted, this plainly was a type of agreement that the parties should have expected would be reduced to writing before any binding obligations were undertaken.

Finally, we note on the last point that section 2104, even if applicable, does not save defendants' position. Since the purported agreement was not made in open court, it could only be enforceable if made in a writing signed by the party who is to be held to it or by his attorney. If viewed in isolation, the May 13 memo might arguably meet this requirement, but it would require us to ignore the May 14 memo, which appeared at least in part to reference one aspect of the terms mentioned in the preceding memorandum. In short, it would be unrealistic to treat the terms in

the May 13 memo in isolation from the May 14 terms.

Accordingly, this version of the defendants' motion should also be denied.

### CONCLUSION

For the reasons stated, we recommend that defendants motion to enforce a settlement be denied.